UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

DENNY MARTIN,                                          Civil Action No. 1:20-cv-10428

                    Plaintiff,

      -against-

BERKSHIRE LIFE INSURANCE COMPANY
OF AMERICA,

                    Defendant.

--------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BERKSHIRE'S MOTION
FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF DENNY MARTIN'S
COMPLAINT**

RIVKIN RADLER LLP
Kenneth C. Murphy
Jay D. Kenigsberg
926 RXR Plaza
Uniondale, New York 11556-0926
(516) 357-3000
*Attorneys for Berkshire Life Insurance Company of
America*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................................... 1

SUMMARY OF ARGUMENT ......................................................................................................... 1

PROCEDURAL HISTORY................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................................. 2

STANDARD FOR SUMMARY JUDGMENT ............................................................................... 6

ARGUMENT ...................................................................................................................................... 7

      I.      PLAINTIFF IS NOT ENTITLED TO BENEFITS BECAUSE HE WAS
            UNABLE TO WORK AS A RESULT OF A LEGAL DISABILITY RATHER
            THAN A FACTUAL DISABILITY .................................................................... 7

      II.     PLAINTIFF IS NOT ENTITLED TO BENEFITS UNDER THE OVERHEAD
            EXPENSE POLICIES ....................................................................................... 12

CONCLUSION.................................................................................................................................. 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*10 Ellicott Square Court Corp. v. Mountain Valley Indemn. Co.*,
   634 F.3d 112 (2d Cir. 2011)..................................................................................13

*BellSouth Telecomms., Inc. v. W.R. Grace &Co.*,
   77 F.3d 603 (2d. Cir. 1996)....................................................................................7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................7

*Chenvert v. The Paul Revere Life Ins. Co.*,
   2004 WL 1739718 (D. Del, 2004) .......................................................................15

*Corines v. American Phys. Ins. Trust*,
   769 F. Supp.2d 584 (S.D.N.Y. 2011)...................................................................12

*Corines v. Sentry Life Ins. Co.*,
   33 A.D.3d 443 (1st Dep't. 2006) ...................................................................11, 12

*Gassler v. Monarch Life Ins. Co.*,
   276 A.D.585, 714 N.Y.S.2d 126 (2d Dep't 2000) .................................................8

*Greenfield v. Philles Records, Inc.*,
   98 N.Y.2d 562, 750 N.Y.S.2d 565 (2002) ..........................................................13

*Guilbert v. Gardner*,
   480 F.3d 140 (2d Cir. 2007)..................................................................................7

*Hershman v. Unumprovident Corp.*,
   660 F. Supp. 2d 527 (S.D.N.Y. 2009)...................................................................7

*Jacobs v. Northwest Mut. Life Ins. Co.*,
   103 A.D.3d 78, 957 N.Y.S.2d 347 (2d Dep't 2012)..........................................7, 8

*Johnson v. Killian*,
   680 F.3d 234 (2d Cir. 2012)................................................................................10

*Massachusetts Mut. Life Ins. Co. v. Ouellette*,
   159 Vt. 187, 617 A.2d 132 (1992) ........................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)..............................................................................................7

*Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*,
  277 F.3d 232 (2d Cir. 2002)............................................................................................13

*Paul Revere Life Ins. Co. v. Bavaro*,
  957 F. Supp. 444 (S.D.N.Y. 1999) ...................................................................................9

*Paul Revere Life Ins. Co. v. Klock*,
  169 So.2d 493 (Fla. Ct. App. 1964)...........................................................................15, 16

*Provident Life Accident Ins. Co. v. Fleischer*,
  26 F.Supp.2d 1220 (S.D. Cal. 1998).........................................................................10, 11

*R/S Assocs. v. N.Y. Job Dev. Auth.*,
  98 N.Y.2d 29, 744 N.Y.S.2d 358 (2002) .........................................................................13

*Richardson v. Guardian Life Ins. Co. of Am.*,
  161 Or. App. 615 (Oregon, 1999)..........................................................................14, 15, 16

*Shapiro v. Berkshire Life Ins. Co.*,
  212 F. 3d 121 (2d Cir. 2000)..............................................................................................7

*Weissman v. First UNUM Life Ins. Co.*,
  44 F.Supp.2d 512 (S.D.N.Y.1999) ....................................................................................8

*Western World Ins. Co. v. Stack Oil*,
  922 F.2d 118 (2d Cir. 1990)...............................................................................................7

*Wilson, D.C. v. Monarch Life Ins. Co.*,
  971 F.2d 312 (9th Cir. 1992) .......................................................................................15, 16

## STATUTES

18 U.S.C. § 287.......................................................................................................................6

18 U.S.C. § 1347..................................................................................................................2, 6

28 U.S.C. Sections 1441 and 1446(a) .....................................................................................1

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ...............................................................................................................6

Federal Rules of Civil Procedure Rule 56 ..........................................................................1, 6

## PRELIMINARY STATEMENT

Defendant Berkshire Life Insurance Company of America ("**Defendant**") respectfully submits this Memorandum of Law in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing plaintiff Denny Martin's ("**Plaintiff**") Complaint in its entirety.

## SUMMARY OF ARGUMENT

In the case at hand, there are no genuine issues as to material facts requiring a trial. The facts in this case establish that a legal disability, specifically, Plaintiff's arrest and preclusion from billing federally funded health insurance payors (97% of his practice income) and not a factual disability, to wit, trigeminal neuralgia or cervical myelopathy, rendered Plaintiff unable to work in his occupation. As a matter of law, disability policies do not provide coverage for a "legal disability." Accordingly, Plaintiff's Complaint against Defendant should be dismissed. Additionally, with respect to the Overhead Expense Disability ("**OED**") Policies, those policies only afford coverage for the operations of an operating business. Insofar as Plaintiff's business was closed due to his arrest, he is not entitled to ongoing operational expenses of that business. Summary judgement is appropriate, therefore, with respect to the OED Policies for that reason as well.

## PROCEDURAL HISTORY

On November 10, 2020, Plaintiff commenced this action against Defendant by filing a Summons and Complaint in the Supreme Court for the State of New York, County of New York for breach of contract. *See*, Kenigsberg Declaration ("Kenigsberg Dec.") Exhibit ("Ex") A. Pursuant to 28 U.S.C. Sections 1441 and 1446(a), Defendant timely filed the Notice of Removal to the United States District Court for the Southern District of New York on December 10, 2020. *See*, Kenigsberg Dec. Ex B.

The Complaint seeks to recover disability benefits in the sum of $800,000 and claims that Plaintiff is entitled to continued benefits because he is disabled due to sicknesses – trigeminal neuralgia and cervical myelopathy. Plaintiff further alleges that he was diagnosed with trigeminal neuralgia in October 2019 and with cervical myelopathy in November 2019. Kenigsberg Dec. Ex A. Defendant filed its Answer and Affirmative Defenses on December 16, 2020 (the "Answer"). Kenigsberg Dec. Ex C.

## STATEMENT OF FACTS

Plaintiff, 49 years old, was the 100% owner of AM PM Medical P.C. ("**AM PM**"), a provider of at-home medical care. (Rule 56.1 Statement of Material Facts ("**R56**") ¶ 4). Plaintiff owned other medical practices that serviced patients in an office setting and at nursing homes and assisted living facilities, but AM PM employed all employees and issued the payroll. (R56 ¶ 5). By September of 2018, Plaintiff was aware that his practice was under investigation for fraudulent billing practices. (R56 ¶ 15). As of March 2019, Medicare and private insurance companies had repeatedly and continuously audited AM PM. (R56 ¶ 16). The audits were ongoing and involved thousands of patients and multiple dates of service. (R56 ¶ 16). In addition, by July 29, 2019, the Center for Medicare and Medicaid Services ("**CMS**") had notified AM PM of its intent to refer debts owed by AM PM for overpayments to the Department of Treasury Debt Collection Center for no less than $926,420.84. (R56 ¶ 17).

All of this culminated on or about September 24, 2019, when a Criminal Court Complaint and Affidavit in support of an arrest warrant ("**Criminal Court Complaint**") were filed by the United States of America against Plaintiff, in the United States District Court, Eastern District of New York, charging plaintiff with Health Care Fraud under 18 U.S.C. § 1347. (R56 ¶ 20). The Criminal Court Complaint charged that, between June 2015 and September 2019, Plaintiff, together with others, engaged in a fraudulent scheme in which he submitted and caused to be

submitted claims for reimbursement to Medicare for services that were, in fact, never performed. Such fraudulent claims were also submitted to Medicare Part C. (*Id.*) (R56 ¶ 21).

On or about September 26, 2019, Plaintiff was arrested. He was later arraigned, before the Hon. Robert M. Levy, who issued an Order Setting Conditions of Release and Appearance Bond ("**Release Order**"). Pursuant to the Release Order, Plaintiff was released from detention on a $1,000,000 bond with one of the additional conditions of release stating that he was no longer permitted to "submit any claims directly [or] indirectly to Medicaid and Medicare." (R56 ¶ 22). As a result of this significant practice restriction, Plaintiff was forced to close his medical practice. (R56 ¶ 23).

Approximately two weeks after his arrest and the issuance of the Release Order, on or about October 12, 2019, Plaintiff, a trained neurosurgeon, submitted a disability claim seeking to recover disability benefits for a neurological disorder under five Individual Disability Policies and three OED Policies issued by Defendant. (R56 at ¶¶ 6,9 and 26). Plaintiff's purported disability stemmed from a "sickness" that he described as "right sided facial and ear pain," the first symptoms of which allegedly arose on June 1, 2019. Plaintiff further represented that he worked in a reduced capacity in his occupation starting June 5, 2019. (R56 ¶¶ 26-27). Plaintiff sought the following payments under the two types of policies:

| Policy Number | Type of Policy | Payment Amount | Term |
|---|---|---|---|
| Z2195350 | Individual | $7,650 monthly plus cost of living ("COLA") adjustments | Until age 65 |
| Z2195360 | Individual | $500 monthly plus COLA | Until age 65 |
| Z9651050 | Individual | $2,350 monthly plus COLA | Until age 65 |
| Z9651060 | Individual | $4,500 monthly plus COLA | Until age 65 |
| Z9836160 | Individual | $1,000 monthly plus COLA | Until age 65 |

| | | | |
|---|---|---|---|
| Z3141490 | Overhead | $20,000 monthly | 18 months |
| Z9829350 | Overhead | $20,000 monthly | 12 months |
| Z3949760 | Overhead | $10,000 monthly | 12 months |

See, R56, ¶¶ 6 and 9.

As relevant for the sake of this motion, the Individual Disability Policies under which

Plaintiff made his claim state:

**Total Disability Benefit**

When You are Totally Disabled, We will pay the Monthly Indemnity as
follows:
- You must become Totally disabled while the Policy is in force.[1]
***
Total Disability or Totally Disabled means that, solely due to Injury or
Sickness, You are not able to perform the material and substantial duties
of Your Occupation.
***
Your occupation means the occupation (or occupations, if more than
one) in which You are Gainfully Employed during the 12 months prior to
the time You become Disabled. [2]

With respect to the OED Policies under which Plaintiff made his claim, they state:

**Overhead Expense Monthly Total Disability Benefit**

While you are Totally Disabled, We will pay monthly benefits if each of
the following conditions are met:

- You become Disabled while the Policy is in force;
- You satisfy the Elimination Period; and
- Proof of Loss is provided to us[3]

After You satisfy the Elimination Period, at the end of each month that
You remain Totally Disabled, We will pay the Policyowner the
Reimbursable Expense Amount up to the Available Benefit.

---

[1] *See, e.g.,* Policy No. Z2195350 at p. 6 (R56 ¶7)
[2] *See, e.g.,* Policy No. Z2195350 at p. 6 (R56 ¶8)
[3] *See e.g.,* Policy No. Z3141490 at p. 7 (R56 ¶12,13)

Reimbursable Expense Amount means the Covered Overhead Expenses You incur and pay for the claimed month less Prior Coverage for that month.[4]

Covered Overhead Expenses means the normal, necessary and customary expenses that You incur and pay in the continued operation of Your Business.[5]

The Elimination Period is shown in the Schedule Page. The Elimination Period is the number of days that must elapse before benefits become payable. The Elimination Period starts on the first day that You are Disabled. You must be Disabled, from the same cause or a different cause for this entire period.[6]

Defendant denied the claim, and this lawsuit for breach of contract and ongoing benefits followed. (R56 at ¶ 36). [7] Discovery revealed that, at the time of his arrest, Plaintiff was the Medical Director of AM PM and more than 97% of its business was sourced from federally funded healthcare programs. (R56 ¶ 23). Because the Release Order prohibited Plaintiff from submitting claims to Medicaid or Medicare, Plaintiff ceased billing or sending any claims for medical services following his arrest. (R56 ¶ 25). Subsequently, on or about October 8, 2019, Plaintiff advised his payroll assistant that the practice was phasing out, and the last paychecks would be issued. (R56 ¶ 24). Plaintiff acknowledged that the Release Order forced him to close his medical practice. (R56 ¶ 23).

Other than his representations on his claim form and the statements in his deposition that his condition commenced in June 2019, there is no factual support that Plaintiff suffered any sickness in the Spring of 2019, or any time prior to his arrest on September 26, 2019. Indeed, the

---

[4] *See e.g.,* Policy No. Z3141490 at p. 6 (R56 ¶ 12)
[5] *See e.g.,* Policy No. Z3141490 at p. 3 (R56 ¶ 11 )
[6] *See, e.g.,* Policy No. Z3141490 at p. 4 (R56 ¶ 12)
[7] Notably, insofar as Plaintiff is only 49 years old, and claims he is totally and permanently disabled, the potential disability payments will be in excess of $3 million. (*See* R56 ¶ 14; *see also,* Kenigsberg Dec. Ex A, the Complaint ¶¶ 4-18).

claim form acknowledges that Plaintiff first sought treatment, a condition precedent under the express terms of his Individual Disability and OED Policies, for his symptoms on October 8, 2019, twelve days after his arrest and the issuance of the Release Order. (R56 ¶ 28). Prior to October 8, 2019, Plaintiff visited with Dr. Hwang for a routine evaluation/cardiology consult, and with Dr. Barsoum, a dentist, for routine care. In neither case did Plaintiff complain of right sided facial and ear pain. Neither record indicates that Plaintiff could not tolerate the procedures. (R56 ¶33). Moreover, the facts developed in this litigation (described more fully below and in greater detail in the R56) demonstrate that during the Summer and Fall of 2019, Plaintiff was actively engaged in expanding his medical practice, seeking volunteer opportunities with his son's private school, travelling to India for two weeks and generally operating his personal and professional life with no limitations whatsoever (e.g., including undertaking efforts to purchase a new home and obtaining insurance for his new Porsche). (R56 ¶¶ 18 and 19). In short, Plaintiff was actively working until his arrest and made no complaints of right sided facial and ear pain until *after* he his arrest and his practice was closed. (R56 ¶¶ 30, 31).

On or about February 5, 2021, Plaintiff was indicted for one count of Health Care Fraud (18 U.S.C. § 1347) and six counts of filing False Claims (18 U.S.C. § 287). On or about May 16, 2022, Plaintiff pleaded guilty to Health Care Fraud before the Hon. Magistrate Judge Peggy Kuo, which was later confirmed in a hearing on June 10, 2022 before the Hon. Carol Bagley Amon. Plaintiff is scheduled to be sentenced before Judge Amon on August 25, 2022. (R56 ¶ 37).

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)

The non-moving party may not rest upon "mere allegations or denials" asserted in its pleadings, or on conclusory allegations, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). Furthermore, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007) *quoting Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (*citing Matsushita Elec. Indus. Co.*, 475 U.S. at 586); *Western World Ins. Co. v. Stack Oil*, 922 F.2d 118, 121 (2d Cir. 1990)). Consequently, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace &Co.*, 77 F.3d 603, 615 (2d. Cir. 1996) (citations omitted).

## **ARGUMENT**

### I.   **PLAINTIFF IS NOT ENTITLED TO BENEFITS BECAUSE HE WAS UNABLE TO WORK AS A RESULT OF A LEGAL DISABILITY RATHER THAN A FACTUAL DISABILITY**

Under New York law, "a claimant is totally disabled when he or she is no longer able to perform the material and substantial responsibilities of his or her job. *Shapiro v. Berkshire Life Ins. Co.*, 212 F. 3d 121, 124 (2d Cir. 2000); see also *Hershman v. Unumprovident Corp.*, 660 F. Supp. 2d 527, 531 (S.D.N.Y. 2009). The insured bears the burden of proving that he or she is totally disabled within the meaning of the insurance policies. *Shapiro*, supra 212 F.3d at 124.

As a rule, disability insurance policies provide coverage for factual disabilities, but not for purely legal disabilities. *Jacobs v. Northwest Mut. Life Ins. Co.*, 103 A.D.3d 78, 83, 957 N.Y.S.2d 347 (2d Dep't 2012). A "factual disability is "an incapacity caused by an illness or injury that prevents a person from engaging in his or her occupation." *Id*. A "legal disability

includes **all circumstances** in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so." Emphasis added. *Id.*

When both a factual disability and legal disability exist, courts determine which of the two disabilities occurred first. *Id.* If the legal disability commenced before the factual disability, then the insured is generally not entitled to benefits because the actual cause of the insured's inability to work is a legal disability, rather than a medical impairment. See, *Gassler v. Monarch Life Ins. Co.*, 276 A.D.585, 714 N.Y.S.2d 126 (2d Dep't 2000).[8] Courts have repeatedly noted that a legal disability includes "all circumstances in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so." *Jacobs,* 103 A.D.3d at 83. Courts have further noted that a "legal disability may be the result of incarceration, the revocation or suspension of a professional license, surrendering a professional license as part of a plea agreement or to avoid disciplinary action, or *practice restrictions* imposed by a licensing board." *Id,* (emphasis added) *citing*; *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 26-27 (Tenn. 2002); *Gassler v. Monarch Life Ins. Co.,* supra 276 A.D.2d at 586 (2d Dep't. 2000); *Massachusetts Mut. Life Ins. Co. v. Ouellette,* 159 Vt. 187, 190-191, 617 A.2d 132, 134 (1992).

Plaintiff here will undoubtedly argue that his license to practice medicine was not suspended as of October 8, 2019, and, therefore, he was not legally disabled when he filed his claim for disability. However, that oversimplifies the analysis. First, while courts have often focused on the binary choice regarding whether a professional's license was or was not valid at the time of the purported onset of the factual disability, *see, e.g., Weissman v. First UNUM Life*

---

[8] Berkshire is not conceding by way of this motion that a factual disability exists in this case. However, for the sake of this motion, the argument is that even if it does, Plaintiff is nevertheless not entitled to coverage.

*Ins. Co.,* 44 F.Supp.2d 512, 521 (S.D.N.Y.1999); *Paul Revere Life Ins. Co. v. Bavaro,* 957 F. Supp. 444, 448 (S.D.N.Y. 1999), the core issue is not just the existence or non-existence of the professional license, it is "practice restrictions" that may preclude a claimant from practicing his "occupation." There is no reason why practice restrictions imposed by a federal court should have any lesser significance than those imposed by a state licensing board.

Here, the evidence overwhelmingly indicates several things. First, Plaintiff's "occupation" was not simply that of a treating physician. Instead, he owned and operated a practice group that catered to a clientele of virtually exclusively Medicare and Medicaid patients (97%). (R56 ¶ 23). He had a staff of, according to him, 60 employees and 20 independent contractors treating these Medicare/Medicaid patients. (R56 ¶ 26). While he made the self-serving claims in his deposition that he was spending between 8 and 10 hours per day treating patients (Kenigsberg Dec. ¶ 7, Ex D, p. 67), his own CPT code data produced in furtherance of his disability application undercut that claim. (R56 ¶ 35). That data revealed minimal billing for medical services by Plaintiff provided to patients. In fact, his own medical work comprised merely 1.3% of the billings of his practice. (R56 ¶ 35). In short, his "Occupation" in the twelve months prior to his claim for disability was that of a medical director of a medical practice focused on a clientele insured by federally funded insurance. As of September 27, 2019, therefore, he was *legally precluded* from practicing that occupation, regardless of whether the state licensing board had yet to take action. Stated otherwise, once he was cut off from billing Medicare/Medicaid by the Release Order, he was legally disabled regardless of the status of his license.

Additionally, any self-serving statements made by Plaintiff that his factual disability preceded his legal one, is not supported by anything but the Plaintiff's own claims. It is well-

settled that "conclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) *quoting Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002). And "summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id. quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no evidence in the record of Plaintiffs purported disability prior to the legal proceedings (and subsequent Release Order) other than his own conclusory allegations to that effect. For example:

(a) No expert has concluded that Plaintiff was disabled prior to October 8, 2019; (R56 ¶ 30)

(b) When he saw his first physician, Christine Stahl, M.D., he indicated that up until that time (October 8, 2019) he had been working full time. (R56 ¶ 29).

(c) The email traffic produced by Plaintiff in discovery indicated he was operating his practice full steam ahead until his arrest, including attempting to open a new facility, trying to obtain new Medicare NPI numbers, managing staff meetings, periodically visiting elderly (Medicare) patients at the Concourse Rehab Nursing home in the Bronx and monitoring the practice call service. (R56 ¶ 18)

(d) Plaintiff – a trained neurosurgeon coincidentally alleging *neurological problems* – claimed his "10/10" pain started in June 2019, yet he failed to see a single neurologist until after his arrest. Instead, he claimed there was a "12 to 16 week waiting period" to get "an appointment with a general neurologist" (although days after his arrest somehow he obtained one). Kenigsberg Dec. ¶ 7, Ex D, pp. 14, 19, 20, and 25 – 28.

(e) By the same token, Plaintiff did see his internist (a trained cardiologist) on or about June 3, 2019 and made no complaint of facial pain. Then, on August 15, 2019, he saw a dentist, received probing and polishing of his teeth *and made not one complaint of right side facial pain.* (R56 ¶ 33)

The facts of this matter are unique and there does not exist substantial precedential authority addressing circumstances such as these. However, there is one case worth noting. Specifically, in *Provident Life Accident Ins. Co. v. Fleischer*, 26 F.Supp.2d 1220 (S.D. Cal.

1998), defendant Fleischer was an insurance agent and financial planner. In 1992, a search warrant was executed on his business. On June 7, 1993, he was indicted and arrested. He spent one month in jail before posting bail. On April 24, 1994, Fleischer filed a disability claim. Three doctors testified that he had depression and/or bipolar disorder (two claimed from the legal proceeding and one claimed since as far back as 1978). The Court granted summary judgment for the insurer and held that Fleischer's disability resulted from a "legal consequence – his incarceration resulting from his criminal activity—rather than from a factual disability." *Fleischer*, at 1223. The Court even noted that although it was finding that the date of factual disability was January 1994, and Fleischer did not actually plead guilty until September 1995 (18 months after he was factually disabled), it did not matter. The key was "the legal consequence of the initiation of the criminal proceeding." *Fleischer* at 1226. It is worth noting that this was not a licensure analysis as typically occurs with doctors and lawyers (i.e., when the license was suspended). And the court used the term "legal consequence" to equate to a legal disability. The Court was not constrained by the traditional analysis that a legal disability is only triggered by a legal edict like a license suspension on a date certain; instead, it was the commencement of the legal proceedings themselves that caused him to have a legal disability.

Another instructive case is *Corines v. Sentry Life Ins. Co.,* 33 A.D.3d 443 (1st Dep't. 2006). While the Court did not address the legal versus factual issue specifically, it did dismiss the Plaintiff's claims where the evidence clearly indicated, as it does in this matter, that Plaintiff continued to work past his date of claimed total disability. There, Plaintiff, a physician, filed claims for disability effective as of June 19, 1998. However, in a separate criminal trial, he testified that he had performed surgical procedures on July 28, December 4 and December 29, 1998. The trial court granted the insurers motion for summary judgment dismissing the

Complaint and the Appellate Division affirmed holding that "[d]ismissal of the complaint [] was warranted by this evidence that plaintiff had continued his medical/surgical practice after claiming he was totally disabled." *Id.* at 444.[9]  Here too the overwhelming evidence establishes that Plaintiff continued to work *after* he claimed he was totally disabled.  The only time he stopped working was when a federal court told him he could not bill Medicare/Medicaid.

Here, the Release Order imposed practice restrictions analogous to the actions of a licensing board.  It constituted a legal determination that prevented Plaintiff from engaging in his occupation.  As there is no evidence that Plaintiff was factually disabled prior to issuance of the Release Order on September 26, 2019, Plaintiff is ineligible to receive disability benefits under the Policies at issue.

## II.    <u>PLAINTIFF IS NOT ENTITLED TO BENEFITS UNDER THE OVERHEAD EXPENSE POLICIES</u>

Plaintiff seeks, in total, a substantial $720,000 pursuant to the OED Policies for a business that was non-operational after the date of his arrest, September 26, 2019.  (*See* Table at pp. 3,4 *supra; see also,* Kenigsberg Dec. Ex A, Complaint at ¶¶ 13-18).  Putting aside the legal disability v. factual disability argument noted above (which pertains to all of the policies), with respect to the OED Policies (Policy No. Z3141490, Z9829350 and Z3949760) Plaintiff is not entitled to payments for a more simple reason.  Specifically, under the clear and unambiguous terms of those policies, and the undisputed facts now uncovered during discovery, within days of his arrest, Plaintiff no longer continued to operate his business.

---

[9] In a separate federal lawsuit brought by Plaintiff in *Corines,* Judge Buchwald in her decision made clear a few more of the underlying facts of Mr. Corines' situation.  Indeed, his license was not suspended for the practice of medicine until *after* he claimed his purported disability.  *See Corines v. American Phys. Ins. Trust,* 769 F. Supp.2d 584, 591 (S.D.N.Y. 2011).

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,* 277 F.3d 232, 236 (2d Cir. 2002). The court "must give 'unambiguous provisions of an insurance contract … their plain and ordinary meaning.'" *10 Ellicott Square Court Corp. v. Mountain Valley Indemn. Co.,* 634 F.3d 112, 119 (2d Cir. 2011) *quoting Essex Ins. Co. v. Laruccia Constr. Inc.,* 71 A.D.3d 818, 898 N.Y.S.2d 558, 559 (2d Dep't. 2010). *See also, Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *R/S Assocs. v. N.Y. Job Dev. Auth.,* 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358 (2002) (recognizing the long-adhered to and "sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language").

The language of the OED Policies is crystal clear. Pursuant to those policies, if Plaintiff was disabled, after a one-month Elimination Period, defined as thirty days from the date of his Disability, he would have been entitled to monthly Reimbursable Expenses. (R56 ¶ 12). Significantly, "Reimbursable Expenses" are defined as "Covered Overhead Expenses," which, in turn, are defined as "the normal, necessary and customary expenses that You incur and pay in the *continued operation of Your Business*." (R56 ¶ 11 (emphasis added)). The "Business" is defined as "an entity, company or professional practice in which [Plaintiff had] an ownership interest." (R56 ¶ 11).

Discovery has proven now that such "business," whether it was AM PM or any of the other entities Plaintiff owned, did not continue to operate as of the date of his arrest. He could not operate because of the Release Order and was forced to immediately cease operations.

Indeed, this is evidenced by an email Plaintiff sent to his accountant, Yitty Lichtenstein, at 6:36 a.m. on October 8, 2019, wherein Plaintiff stated: "Please give me net amounts so we can cut paper checks for everyone. For most, this will be their last paycheck as the practice is phasing out." (R56 ¶ 23, 24). Notably, October 8, 2019, at 6:36 a.m. was clearly *before* Plaintiff had even received his first diagnosis of trigeminal neuralgia, which he received at an appointment with a neurologist, Christine Stahl, M.D. later that day. (R56 ¶ 28). This was also four days before Plaintiff filed his disability claim application. (R56 ¶ 26, Claim Application at p. 2 and 7). The fact that his "business" was non-operational as of the end of September 2019 is also supported by Plaintiff's own deposition testimony. (R56 ¶ 23, Kenigsberg Dec. ¶ 7, Ex D, pp. 153 – 155, and ¶ 31, Ex ZZ.

While this argument is a simple and basic interpretation of a contract that should not require citation to any prior legal authority, there is relevant precedent from other jurisdictions that can offer the Court guidance. For example, in *Richardson v. Guardian Life Ins. Co. of Am.*, 161 Or. App. 615 (Oregon, 1999), the insured, a doctor, had two business overhead expense policies. Each policy covered up to $2,000 per month in overhead expenses of Richardson's dental practice in case he became totally disabled. The policy defined "covered expenses" as "regular business expenses . . . which you normally incur in the conduct of your business or profession." Richardson's health began to deteriorate, and he entered into negotiations to sell his stock in his professional corporation to his employee, Dr. Keys. Shortly thereafter, Richardson was no longer able to work as a dentist and was totally disabled within the meaning of the policies. Keys then became concerned that she would not be able to pay the overhead expenses while she was building up her clientele. Richardson and Keys eventually went through with the sale, with Richardson agreeing to pay the overhead expenses for one year. Richardson submitted

a claim to Guardian, which Guardian denied.  Richardson sued Guardian for breach of contract, bad faith, violations of Oregon's unfair claims settlement practices statute, and other causes of action.  Guardian was awarded summary judgment and the Oregon Court of Appeals affirmed.  The court held that the policies' definition of "covered expenses" showed an intention that the insured must actually be in business in order to incur covered expenses**.**  *Id*. at 619.  Richardson did not conduct a business or profession after he sold his stock.  Thus, the policies did not cover his payment of overhead expenses, and Guardian did not breach its obligation under the policies to provide business overhead expense coverage and was entitled to summary judgment on that claim.  *Id*. at 621.

In *Chenvert v. The Paul Revere Life Ins. Co.,* 2004 WL 1739718 (D. Del, 2004), Plaintiff Chenvert, a dentist, became disabled.  He filed for overhead expenses, some of which were reimbursed by the employer.  However, for other expenses after his practice closed, the insurer denied coverage.  Chevert sued.  The policy language covered "those fixed, monthly expenses incurred in [y]our [o]ccupation that are ordinary and necessary in the operation of [y]our business or profession." *Id.* at *3.  The Court granted the insurer summary judgment noting that [t]he BOE policy expressly includes fixed monthly expenses incurred during a period of total disability in the operation of the insured's business.  The language plainly provides coverage for certain expenses incurred *while the insured's business is in operation.*  The key word is 'operation', meaning ongoing.  When Chevert ceased operation of the dental practice, he no longer incurred expenses covered under the policy." *Id.* at *4 (emphasis added).  *See also, Wilson, D.C. v. Monarch Life Ins. Co.,* 971 F.2d 312, 313 (9th Cir. 1992) (Ninth Circuit affirming grant of summary judgment to insurer that denied coverage to a disabled dentist seeking reimbursement for overhead expenses after he sold his practice); *Paul Revere Life Ins. Co. v.*

*Klock*, 169 So.2d 493 (Fla. Ct. App. 1964) (denying overhead expenses for disabled claimant after business was sold).

Although Plaintiff did not *sell* his business as the claimants did in *Richardson*, *Wilson* and *Klock*, he closed his business and no longer operated it as a result of the criminal proceeding initiated against him and the Release Order. That difference is inconsequential, in either case the business was no longer operational. Moreover, the policy language here is virtually identical to that in *Chevert*. Accordingly, Plaintiff does not qualify for a monthly benefit under the OED Policies because his business, AM PM, did not continue to operate beyond October 2019.

## CONCLUSION

For all the reasons set forth herein, Defendant respectfully requests that this Court grant Defendant's motion for summary judgment dismissing the Complaint in its entirety and grant such other relief as the Court deems just and proper.

Dated: Uniondale, New York
      August 3, 2022

                                    Respectfully Submitted,

                                    **RIVKIN RADLER LLP**

                                    By: */s/ Kenneth C. Murphy*_____
                                    Kenneth (Casey) Murphy
                                    Jay Kenigsberg
                                    926 RXR Plaza
                                    Uniondale, New York 11556
                                    Tel: (516) 357-3000
                                    Fax: (516) 357-3333
                                    Email: casey.murphy@rivkin.com
                                    Attorneys for Defendant
                                    Berkshire Life Insurance Company of America

5922745-v1