UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENNY MARTIN,

                *Plaintiff*,

-against-

BERKSHIRE LIFE INSURANCE COMPANY
OF AMERICA,

                *Defendant*.

Civil Action No. 1:20-cv-10428

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' RULE 56.1 STATEMENT OF FACTS**

Pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York, Plaintiff Denny Martin ("Plaintiff") hereby responds to the Statement of Material Facts served on August 3, 2022 by Defendant Berkshire Life Insurance Company ("Berkshire" or "Defendant").

1. Plaintiff admits the assertions in paragraph 1.

2. Plaintiff admits the assertions in paragraph 2; and further avers that he also trained in the United States as a neurosurgeon.

3. Plaintiff admits the assertions in paragraph 3.

4. Plaintiff admits the assertions in paragraph 4.

5. Plaintiff admits the assertions in paragraph 5, except denies that all of the employees of the various companies were employed solely by AM PM Medical P.C. Each of the employees was employed and credentialed through each of the companies for which they worked.

1

(Affidavit of Plaintiff Denny Martin in Opposition to Defendant Berkshire's Motion for Summary Judgment ("Martin Aff.") at ¶ 10.)

6. Plaintiff admits the assertions in paragraph 6.

7. Plaintiff denies the assertions in paragraph 7, as paragraph 7 fails to provide the full definition of "Total Disability or Totally Disabled" as listed in each of the individual disability policies. (Kenigsberg Dec. at Exhs. F, G, H, I, J.) Plaintiff further notes that policy number Z9836160 includes language that is different from the other four individual disability policies. (*Compare* Kenigsberg Dec. at Exhs. F, G, H, I *with id.* at Exh. J, p. 6.)

8. Plaintiff denies the assertions in paragraph 8, as paragraph 8 fails to provide the full definition of "Your Occupation" as listed in each of the individual disability policies. Plaintiff further notes that policy number Z9836160 includes language that is different from the other four individual disability policies. Policy number Z9836160 provides that "Your Occupation does not mean a specific job title, designation, industry, or job with a certain employer." (Kenigsberg Dec. at Exh. J.) The other four disability policies provide that "If You have limited Your Occupation to the performance of the material and substantial duties of a single medical specialty or to a single dental specialty, We will deem that specialty to be Your Occupation." (Kenigsberg Dec. at Exhs. F, G, H, I.)

9. Plaintiff admits the assertions in paragraph 9.

10. Plaintiff admits the assertions in paragraph 10.

11. Plaintiff denies the assertions in paragraph 11, as paragraph 11 fails to provide the full definition of "Covered Overhead Expenses" as set forth in each of the policies. (Kenigsberg Dec. at Exhs. K, L, M.)

12. Plaintiff denies the assertions in paragraph 12, as vague and confusing. Paragraph 12 does not clearly indicate which language it is quoting from the referenced policy provisions.

13. Plaintiff denies the assertions in paragraph 13, as vague and confusing. Paragraph 13 does not clearly indicate which language it is quoting from the referenced policy provisions.

14. Plaintiff admits the assertions in paragraph 14.

15. Plaintiff denies the assertions in paragraph 15. Plaintiff was not aware that he was being investigated for fraudulent billing practices until the day of his arrest. (Martin Aff. at ¶ 21.)

16. Plaintiff admits the assertions in paragraph 16, but avers that the audits of Plaintiff's business were routine audits. Medicare audits of large practices are not unusual. Plaintiff's business was successful in each of the audits, with determinations that its error rate was less than 3%. (Martin Aff. at ¶ 22.)

17. Plaintiff admits the assertions in paragraph 17; but avers that AM PM Medical disputed the notices sent by the Department of Treasury Debt Collection Center. (Martin Aff. at ¶ 23.)

18. Plaintiff denies the assertions in paragraph 18. Plaintiff was not actively seeking to expand his business. Each of the referenced activities concern Plaintiff following up on business projects that were initiated long before 2019. Plaintiff did not directly see patients after August 28, 2019. (Martin Aff. at ¶ 19, 24.)

19. Plaintiff admits engaging in the specific activities listed in each of the sub-paragraphs to paragraph 19, but denies that they constitute "significant personal activities."

20. Plaintiff admits the assertions in paragraph 20.

21. Plaintiff denies the assertions in paragraph 21; except admits that, on or about September 26, 2019, he was arrested and arraigned on the Criminal Court Complaint; and avers that the Criminal Court Complaint speaks for itself.

22. Plaintiff admits the assertions in paragraph 22.

23. Plaintiff denies the assertions in paragraph 23. *See* Martin Aff. at ¶ 45, n.2. Plaintiff further avers that he could have continued to operate his medical practice by temporarily downsizing and re-focusing the practice on treating patients who either self-paid or who had private insurance. Approximately 20 to 30 percent of the practice's existing patients already either utilized private insurance (1,724 patients) or self-paid. Almost all of AM PM Urgent Care's patients self-paid. (Martin Aff. at ¶¶ 43, 45.)

24. Plaintiff admits the assertions in paragraph 24.

25. Plaintiff admits the assertions in paragraph 25.

26. Plaintiff denies the assertions in paragraph 26. While Plaintiff's companies ceased providing medical services by the end of December 2019, his entities have never been dissolved and, in fact, remain in operation. (Martin Aff. at ¶¶ 33-36.)

27. Plaintiff admits the assertions in paragraph 27.

28. Plaintiff denies the assertions in paragraph 28, except that Plaintiff admits that the Claimant's Statement describes the nature of his sickness as "right sided facial and ear pain." The Claimant's Statement further provides that Plaintiff's October 8, 2019 visit to Dr. Christine Stahl was the first date that Plaintiff was treated by a physician or other medical care provider for his condition. As recorded in Dr. Stahl's notes from that visit, Plaintiff had been experiencing facial pain for 4-5 months and had been self-treating his pain with Tylenol, Motrin, and cold packs. (Martin Aff. at ¶ 26, Exh. A.)

29.     Plaintiff denies the assertions in paragraph 29.  The form referenced by Berkshire is in error.  As Dr. Stahl acknowledged in her Attending Physician's Statement to Berkshire, Plaintiff had already stopped working at the time of his initial consultation on October 8, 2019. (Martin Aff. at ¶ 26, Exh. B.)

30.     Plaintiff denies the assertions in paragraph 30.  Plaintiff saw a dental hygienist on August 15, 2019 and ruled out the possibility of a dental cause for his facial and jaw pain.  (Martin Aff. at ¶ 17.)

31.     Plaintiff denies the assertions in paragraph 31.  Plaintiff saw a dental hygienist on August 15, 2019 and questioned the dental hygienist as to whether she saw any dental problems with Plaintiff's jaw.  (Martin Aff. at ¶ 17.)

32.     Plaintiff denies the assertions in paragraph 32.  Plaintiff is not a trained neurologist; Plaintiff is a trained neurosurgeon.  (Martin Aff. at ¶ 3.)

33.     Plaintiff denies the assertions in paragraph 33, except admits that on June 3, 2019, Plaintiff saw Dr. Seol Young Han Hwang, MD, for a routine of cardiology consult.  Plaintiff has never been seen or treated by Dr. Michael Barsoum, and the documentation submitted by Berkshire does not support that assertion.  (Martin Aff. at ¶ 32.)

34.     Plaintiff denies the assertions in paragraph 34.  The assertions in paragraph 34 are not supported by the document cited by Berkshire.  Plaintiff further refers the Court to Martin Aff. at ¶ 15, which shows his dramatically lower billing during the months of June, July, and August 2019, along with the deposition transcripts of Renee Springer Manauris Rodriguez Cruz.  *See* Sperber Decl. at Exh A [Deposition Transcript of Renee Springer] at 29: 11-23, 47:3-24, 194: 6-22, 195: 8-23, 196: 2-22, and Exh B [Deposition Transcript of Manauris Rodriguez Cruz] at 16:2-25, 17: 20-25, 18: 5-14.

35. Plaintiff denies the assertions in paragraph 35. Plaintiff's billed charges for that time period were approximately $2 million, which constituted in excess of 5% of the companies' total billed charges. In addition, Plaintiff's work on behalf of AM PM Urgent Care is not reflected in his billed insurance charges, as AM PM Urgent Care only treated patients who self-paid. (Martin Aff. at ¶¶ 13, 15.)

36. Plaintiff admits the assertions in paragraph 36.

37. Plaintiff admits the assertion in paragraph 37, except avers that his sentencing hearing has been adjourned.

**PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1 of the Southern District of New York, plaintiff Denny Martin submits this counter-statement of undisputed material facts in opposition to Berkshire's motion for summary judgment.

1. Plaintiff Denny Martin continuously practiced medicine as a licensed medical doctor from 2009 until his medical disability forced him to stop in October 2019. (Martin Aff. at ¶ 3.)

2. Plaintiff was the owner of several very successful medical care companies. (Martin Aff. at ¶¶ 4-11.)

3. In or around 2013, Plaintiff started Denny Martin MD PC, which provided medical care in facilities like nursing homes and assisted living facilities, along with performing various bedside procedures. Plaintiff was—and still is—the sole, 100% owner of Denny Martin MD PC. (Martin Aff. at ¶ 4.)

4. When he opened Denny Martin MD PC, Plaintiff employed one nurse practitioner and two administrative assistants, and had between 100 and 150 patients. Within a year, he had hired an additional physician assistant and the practice had grown to approximately 400 patients. At that time, approximately 70 to 80 percent of the practice's patients used Medicare or Medicaid, while the remainder used either private insurance or self-paid. (Martin Aff. at ¶ 5.)

5. In or around 2014, Plaintiff started AM PM Medical PC ("AM PM Medical"), which provided medical care in patients' homes. Plaintiff was—and still is—the sole, 100% owner of AM PM Medical. (Martin Aff. at ¶ 6.)

6. Plaintiff started to receive referrals at a rate of nearly 50 new patients per week and the company grew extremely rapidly. By 2017, AM PM Medical had approximately 6,000 patients and thereafter continued to grow by an average of 1,500 active new patients each year. To keep up with the company's growth, Plaintiff hired medical providers and administrative staff at an extremely rapid rate. (Martin Aff. at ¶ 7.)

7. By the end of 2017, AM PM Medical employed a staff of between 25 and 30 employees. At that time, approximately 70 to 80 percent of the practice's patients used Medicare or Medicaid, while the remainder used either private insurance or self-paid. (Martin Aff. at ¶ 8.)

8. In or around late 2017, Plaintiff started Transitional Care Medical Services PLLC, which provided services to patients who had recently been discharged from hospitals or skilled nursing facilities, and AM PM Urgent Care, which provided medical services in an office setting. (Martin Aff. at ¶ 9.)

9. All of the employees for these companies (along with Denny Martin MD PC) were employed and credentialed by all of the entities, but paid through AM PM Medical for the simplification of accounting purposes. (Martin Aff. at ¶ 10.)

10. By 2019, AM PM Medical had a staff of 60 employees on payroll, including approximately two dozen medical providers, and further utilized 20 independent contractors. At that time, Denny Martin MD PC had approximately 600 patients, AM PM Medical had approximately 9,000 patients, Transitional Care had approximately 1,500 patients, and AM PM Urgent Care had approximately 150 visits per day. By 2019, approximately 70 to 80 percent of the practice's patients used Medicare or Medicaid, while the remainder used either private insurance (1,724 patients) or self-paid. Almost all of AM PM Urgent Care's patients were self-paid. (Martin Aff. at ¶ 11.)

11. Plaintiff left the management of these companies to administrative employees, while he spent his own time treating patients. In 2018 and 2019, Plaintiff would typically begin work each day between 7:00am and 7:30am. He would treat patients at Concourse Rehab & Nursing Center for approximately three hours on behalf of Denny Martin MD PC. Most of the patients that he would treat were extremely ill, and Plaintiff was responsible for handling their most acute problems. For the next eight hours, Plaintiff would then make house calls to patients on behalf of AM PM Medical and Transitional Care, and treat patients in AM PM Urgent Care's two clinics. (Martin Aff. at ¶ 12.)

12. For the period of June 2018 through August 2019, Plaintiff's billed charges were approximately $2 million, which constituted in excess of 5% of the companies' total billed charges. In addition, Plaintiff's work on behalf of AM PM Urgent Care is not reflected in his billed insurance charges, as AM PM Urgent Care treated patients who self-paid. (Martin Aff. at ¶ 13.) By 2019, Plaintiff had non-Medicare/Medicaid revenues in excess of $200,000 per month. (Martin Aff. at ¶ 45.)

13. Starting in the Spring of 2019, Plaintiff began experiencing the first manifestations of trigeminal neuralgia and cervical myelopathy in the form of right sided facial and jaw pain, along with neck pain and clumsiness of his hands. As the pain progressively worsened, Plaintiff found that he was unable to continue his full work schedule. (Martin Aff. at ¶ 14.)

14. Plaintiff's billed insurance charges for the period of June 2018 through August 2019 are reflected on the following chart:



This chart does not include the revenue generated by Plaintiff from patients who self-paid. (Martin Aff. at ¶ 15.)

15. Witnesses have testified that in May and June 2019, Plaintiff appeared visibly unwell and stopped coming into the office as a result of his health condition. According to their

recollection, at that time it became difficult for him to visit patients in buildings that lacked elevators, where he would have to climb the stairs to reach their apartments. (Sperber Decl. at Exh A [Deposition Transcript of Renee Springer] at 29: 11-23, 47:3-24, 194: 6-22, 195: 8-23, 196: 2-22, and Exh B [Deposition Transcript of Manauris Rodriguez Cruz] at 16:2-25, 17: 20-25, 18: 5-14.)

16. To deal with his pain and other symptoms, Plaintiff initially treated himself with increasing dosages and frequency of Tylenol, Motrin, and cold facial compresses. (Martin Aff. at ¶ 16.)

17. In August 2019, Plaintiff was seen by a dental hygienist at Dr. Gregg Monterosso's office and was able to rule out the possibility that his pain was the result of a dental issue. (Martin Aff. at ¶ 17.)

18. Plaintiff next attempted to schedule an appointment with a general neurologist, Drs. Berk, Cardiel, and Levitan, who Plaintiff knew professionally to be very reputable, but found that there was a three- to four-month waiting period. Plaintiff subsequently obtained an appointment with Dr. Christine Stahl at the Movement Disorders Clinic at NYU Hospital for October 8, 2019. (Martin Aff. at ¶ 18.)

19. Plaintiff independently treated his last patient on August 28, 2019. After that date, his only activity as a doctor was signing off on admissions and discharges for mid-level providers at Concourse Rehab and Nursing pursuant to facility policy and requirements. Plaintiff's last patient sign-off was on September 18, 2019. (Martin Aff. at ¶ 19.)

20. On September 26, 2019 Plaintiff was arrested by the Department of Health and Human Services and charged with Health Care Fraud under 18 U.SW.C. 1347. Plaintiff was released by the Hon. Magistrate Robert M. Levy pursuant to an Order Setting Conditions of

Release and Appearance Bond (the "Release Order"). The Release Order provided that, as a condition of Plaintiff's release, he was no longer permitted to "submit any claims directly [or] indirectly to Medicaid and Medicare." (Martin Aff. at ¶ 20.)

21.     Beginning in early October, given his rapidly declining health, Plaintiff began the process of winding down his practice. (Martin Aff. at ¶ 25.)

22.     On October 8, 2019, Plaintiff had his initial appointment with Dr. Stahl. Dr. Stahl's notes from that visit indicate that Plaintiff presented with "4-5 months of R facial pain… Feels like a zapping and sharp pain. Pain 10/10 at its worst, but there is always a constant pain (~4-5/10) with some relief from tylenol, motrin, cold packs…. He saw a dentist who didn't find any dental abnormalities, so he presents today for evaluation." Dr. Stahl also noted on her "Attending Physician Statement" that, on the date of Plaintiff's first visit, "Patient already stopped working at time of consult." (Martin Aff. at ¶ 26 and Exhs. A and B.)

23.     Dr. Stahl diagnosed Plaintiff with right-sided trigeminal neuralgia and ordered an MRI of the brain and of the cervical spine, which confirmed her diagnosis of trigeminal neuralgia but also raised questions about the possibility that Plaintiff might also be suffering from cervical myelopathy. Dr. Stahl started Plaintiff on medication for his trigeminal neuralgia. (Martin Aff. at ¶ 27 and Exhs. A and B.)

24.     Dr. Stahl referred Plaintiff to neurosurgery for cervical myelopathy and scheduled Plaintiff an appointment with Drs. Berk, Cardiel, and Levitan. Even with that scheduling assistance, however, Plaintiff was still only able to see a junior neurologist at the practice. Plaintiff subsequently scheduled a consultation with neurosurgery and pain management at Mt. Sinai Hospital. (Martin Aff. at ¶ 28.)

25. By the end of October, now encumbered by the debilitating side effects of his medication—including severe dizziness, drowsiness, and visual problems—Plaintiff laid off most of his medical staff. A small administrative staff continued working at his medical practices until the end of December to handle calls from patients. (Martin Aff. at ¶ 29.)

26. On November 13, 2019, Plaintiff saw Drs. Kahn and Caridi. Dr. Caridi recommended that Plainitff undergo a c4/6 ACDF (anterior cervical discectomy and fusion) for his cervical myelopathy. Plaintiff, aware of the risks and complications of such surgery, declined to proceed. Dr. Caridi then referred Plaintiff to Dr. Shrivastava, who recommended a craniotomy and microvascular decompression of his trigeminal nerve for his trigeminal neuralgia. Plaintiff, again aware of the risks and complications of such treatment, declined. Dr. Shrivastava also ordered a 7T MRI of Plaintiff's brain, which in fact revealed early bifurcation of the right superior cerebellar artery as the cause of Plaintiff's trigeminal neuralgia. (Martin Aff. at ¶ 30.)

27. Plaintiff elected to treat his conditions conservatively with high dosages of neuropathic medication, which had profound and significant side effects including dizziness, balance issues, drowsiness, blurry vision, double vision, and cognitive deficits. (Martin Aff. at ¶ 31.)

28. While Plaintiff's companies ceased providing medical services by the end of December 2019, his entities have never been dissolved and, in fact, remain in operation. (Martin Aff. at ¶ 33.)

29. Denny Martin MD PC owned—and still owns—an apartment at 1641 Third Avenue, Unit 2A, New York, New York 10128, which it had originally purchased as a commercial property. As of January 2020, it was paying a mortgage on that property at the rate of

$10,928.20/month and real estate taxes of $23,078.32 per year, along with a monthly maintenance of $1,350.  (Martin Aff. at ¶ 34.)

30. As of January 2020, Denny Martin MD PC and AM PM Medical jointly had several outstanding commercial loans, one in the amount of $1,264,211.03 at 4.09% interest, another in the amount of $350,000 at 6.8% interest, and another in the amount of $252,407.30 at 5.54% interest.  Denny Martin MD PC and AM PM Medical also jointly had a lease at 930 Grand Concourse, Bronx, New York 10451.  As of January 2020, monthly rent on that property was $11,723.12.  (Martin Aff. at ¶ 35.)

31. In addition, Martin Enterprises—a company started by Plaintiff in 2017 to hold real estate and provide operational support for his practice—owned an office at 350 West 58th Street, New York, New York, 10019, on which, as of January 2020, it was paying a mortgage at the rate of $7,630.54 per month and real estate taxes of $26,003.24, along with a monthly maintenance fee of around $2,500.  At that time, Martin Enterprises also had an outstanding commercial loan in the amount of $1,095,034.69 at 4.74% interest, along with an SBA loan in the amount of $898,446.  (Martin Aff. at ¶ 36.)

32. Between 2011 and 2018, Defendant Berkshire Life Insurance Company issued five Individual Disability policies to Plaintiff (Z2195350, Z2195360, Z9651050, Z9651060, and Z9836160).  Each of the policies provides as follows:

> **Total Disability Benefit**
> When You are Totally Disabled, We will pay the Monthly Indemnity as follows:
> - You must become Totally Disabled while the Policy is in force.
> - You must satisfy the Elimination Period.
> - After You have satisfied the Elimination Period, Monthly Indemnity will be payable at the end of each month while You remain Totally Disabled.

- Monthly Indemnity will stop at the end of the Benefit Period or, if earlier, on the date You are no longer Totally Disabled.

The policies each define the term "Totally Disabled" as

> Total Disability or Totally Disabled means that, solely due to Injury or Sickness, You are not able to perform the material and substantial duties of Your Occupation.
>
> You will be Totally Disabled even if You are Gainfully Employed in another occupation so long as, solely due to Injury or Sickness, You are not able to work in Your Occupation.
>
> Working an average of more than 40 hours in a week, in itself, is not a material and substantial duty.

(Kenigsberg Dec. at Exhs. F, G, H, I, J.)

Four of the policies further define the term "Your Occupation" as:

> Your Occupation means the occupation (or occupations, if more than one) in which You are Gainfully Employed during the 12 months prior to the time You become Disabled.
>
> If You have limited Your Occupation to the performance of the material and substantial duties of a single medical specialty or to a single dental specialty, We will deem that specialty to be Your Occupation.

(Kenigsberg Dec. at Exhs. F, G, H, I.)

Policy number Z9836160, however, has a slightly different definition of the term:

> Your Occupation means the occupation (or occupations, if more than one) in which You are Gainfully Employed during the 12 months prior to the time You become Disabled. Your Occupation does not mean a specific job title, designation, industry, or job with a certain employer.

(Kenigsberg Dec. at Exh. J.)

33.    Between 2015 and 2018, Berkshire also issued three Overhead Expense Disability ("OED") policies to Plaintiff (Z3141490, Z9829350, and Z3949760).  Each of the OED Policies provide that

14

> While You are Totally Disabled, We will pay monthly benefits if each of the following conditions are met:
> - You become Disabled while the Policy is in force;
> - You satisfy the Elimination Period; and
> - Proof of Loss is provided to Us.
>
> After You satisfy the Elimination Period, at the end of each month that You remain Totally Disabled, We will pay the Policyowner the Reimbursable Expense Amount up to the Available Benefit.

The OED Policies provide that the "Reimbursable Expense Amount" means "the Covered Overhead Expenses You incur and pay for the claimed month less Prior Coverage for that month."

They further provide the following definition for "Covered Overhead Expenses":

> Covered Overhead Expenses means the normal, necessary and customary expenses that You incur and pay in the continued operation of Your Business.
>
> In the event of multiple owners or joint occupancy, Covered Overhead Expenses means that part of such normal, necessary and customary expenses for which You are responsible.
>
> Covered Overhead Expenses must be deductible for federal income tax purposes. Covered Overhead Expenses include:
>
> - real estate and property taxes;
> - utilities, such as heat, water, electricity and telephone;
> - laundry, janitorial and maintenance services;
> - salaries and employer-paid benefits of employees who have no ownership interest in Your Business and who are not members of Your profession;
> - property, liability, malpractice and other business insurance premiums that have not been waived due to Your Disability;
> - professional, trade and association dues;
> - licensing fees, including continuing education costs required to maintain such professional license;
> - legal and accounting fees paid except those that are directly related to the termination or sale of Your Business;
> - billing and collection fees;
> - rent or lease payments for space which You occupy and use in the continued operation of Your Business;
> - rent or lease payments for motor vehicles, equipment, fixtures, furniture or other assets used in the continued operation of Your Business if You have no direct or indirect ownership in the assets;
> - scheduled installment payments of interest on debt; and

- depreciation or scheduled installment payments of principal on debt for which You were liable before You became Disabled, but not both, regardless of whether these are deductible for federal income tax purposes. The choice must be made only once for each separate Disability at the time the claim begins. The amount of depreciation allowed will be that used for federal income tax purposes. The amount of principal will not be more than that paid under a plan of scheduled installment payments which begin before the start of Disability.

**Expenses Not Covered**
Covered Overhead Expenses do not include:

- that portion of normal and customary business expenses which is the obligation of any person other than You;
- any expense for which You were not normally and customarily liable on a periodic basis prior to the start of Disability;
- any other expenses that have been waived, reimbursed or are reimbursable from any other source;
- any prepayment or advance payment of a Covered Overhead Expense;
- any salary, fee, draw, advance, benefit or other remuneration for a member of Your Family who was not a paid employee during the 60 days immediately prior to Your Disability;
- income taxes or self-employment taxes;
- any expense for equipment, motor vehicles, fixtures, furniture or other assets purchased or leased after the date You became Disabled;
- the cost of inventory, merchandise, products, goods and services directly attributable to generating revenue;
- the cost of implements of Your profession;
- the cost of supplies, fees and expenses passed on to Your clients; and
- the cost of gifts, charitable donations, meals and entertainment.

(Kenigsberg Dec. at Exhs. K, L, M.)

34. The OED Policies also define "You and Your" as "the person insured, who is named in the Schedule Page" (i.e., Plaintiff) and "Business" as "an entity, company or professional practice in which You have an ownership interest." (Kenigsberg Dec. at Exhs. K, L, M.)

35. On or about October 12, 2019, Plaintiff submitted a Disability Claimant's Statement Description of Occupation form to Berkshire. Berkshire denied Plaintiff's claim and Plaintiff was forced to commence this action via Summons and Complaint dated November 10, 2020. (Martin Aff. at ¶ 39.)

36. Over the course of this litigation, Plaintiff's experts, Drs. Hausknecht and Krishna, confirmed Plaintiff's diagnosis of trigeminal neuralgia and cervical myelopathy, and further opined that as a result of those conditions and the debilitating side effects of the medication that Plaintiff has been prescribed, Plaintiff is unable to perform the material and substantial duties of any occupation—including that of medical doctor. (Martin Aff. at ¶ 40, Exhs. E and F.)

37. On or about July 12, 2022, after an extensive administrative process including a hearing before ALJ Lori Romeo, the Social Security Administration issued a "fully favorable" decision finding that Plaintiff was disabled as of October 1, 2019 and awarding him Social Security disability benefits. (Martin Aff. at ¶ 41, Exh. G.)

Dated: Kew Gardens, New York
August 31, 2022

**LIPSIUS-BENHAIM LAW LLP**
*Attorneys for Plaintiff Denny Martin*

By: _____
Ira S. Lipsius
Alexander J. Sperber
80-02 Kew Gardens Road, Suite 1030
Kew Gardens, New York 11415
Telephone: 212-981-8440
Facsimile: 888-442-0284
ilipsius@lipsiuslaw.com
asperber@lipsiuslaw.com