**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DENNY MARTIN,

                      *Plaintiff,*

      -against-

BERKSHIRE LIFE INSURANCE COMPANY
OF AMERICA,

                      *Defendant.*

Civil Action No. 1:20-cv-10428


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BERKSHIRE LIFE**
**INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**


LIPSIUS BENHAIM LAW LLP
80-02 Kew Gardens Road
Suite 1030
Kew Gardens, New York 11415
Telephone: (212) 981-8440
*Attorneys for Plaintiff Denny Martin*


*Of Counsel:*
      Ira S. Lipsius
      Alexander J. Sperber

## Table of Contents

PRELIMINARY STATEMENT ……………………………………………………  1

FACTS ……………………………………………………………………………  1

ARGUMENT ……………………………………………………………………..  11

   A.  STANDARD FOR SUMMARY JUDGMENT …………………………….  11

   B.  PLAINTIFF IS NOT "LEGALLY DISABLED" FROM ENGAGING IN HIS
      OCCUPATION …………………………………………………………...  12

      1.  Berkshire's Narrow Characterization of Plaintiff's Occupation is Without
         Legal Basis ……………………………………………………………  14

      2.  Plaintiff's Occupation was "Doctor," Not "Medical Director" ………….  17

      3.  Plaintiff's Purported Legal Disability Does Not Prevent Him from Either
         Practicing Medicine or Working as a Medical Director ……………….  17

      4.  Plaintiff's Purported Legal Disability Does Not Prevent Him from
         Continuing His Medical Practice ………………………………………  20

      5.  Plaintiff's Medical Disability Commenced Prior to his Purported Legal
         Disability ………………………………………………………………  21

      6.  Plaintiff Did Not Continue to Work After His Disability Prevented Him
         From Engaging in his Occupation ………………………………………..  21

   C.  PLAINTIFF IS ENTITLED TO BENEFITS UNDER THE OVERHEAD EXPENSE
      POLICIES ………………………………………………………………..  22

CONCLUSION ………………………………………………………………...  25

## Table of Authorities

### CASES

*Blasbalg v. Mass. Cas. Ins. Co.*,
    962 F. Supp. 362 (E.D.N.Y. 1997) …………………………………………… 16, 24

*Brumer v. Nat'l Life*,
    874 F. Supp. 60 (E.D.N.Y. 1995) …………………………………………… 18

*Dawes v. First UNUM Life Ins. Co.*,
    851 F. Supp. 118 (S.D.N.Y. 1994) …………………………………………… 12, 14

*Dean v. Tower Ins. Co. of New York*,
    19 N.Y.3d 704 (2012) ………………………………………………………… 16, 24

*Dionida v. Reliance Standard Life Ins. Co.*,
    50 F. Supp. 2d 934 (N.D. Cal. 1999) ………………………………………….. 15

*Gassler v. Monarch Life Ins. Co.*,
    276 A.D.2d 585 (2d Dep't 2000) …………………………………………… 18

*Godesky v. First Unum Life Ins. Co.*,
    239 A.D.2d 547 (2d Dep't 1997) ………………………………………….. 13

*Green v. Town of East Haven*,
    952 F.3d 394 (2d Cir. 2020) ………………………………………………… 12

*Hanser v. Ralston Purina Co.*,
    821 F. Supp. 473 (E.D. Mich. 1993) ………………………………………….. 15

*Impax Labs., Inc. v. Turing Pharms. AG*,
    16 Civ. 3241 (ER), 2017 U.S. Dist. LEXIS 164133 (S.D.N.Y. Sep. 28, 2017) … 12

*Jacobs v. Northwestern Mut. Life Ins. Co.*,
    103 A.D.3d 78 (2d Dep't 2012) ……………………………………………… 18, 21

*Kessler v. Wetchester Cnty Dep't of Social Svcs.*,
    461 F.3d 199 (2d Cir. 2006) ………………………………………………… 12

*Kinstler v. First Reliance Standard Life Ins. Co.*,
    181 F.3d 243 (2d Cir. 1999) ………………………………………………… 14, 17

*Klein v. National Life of Vt.*,
    7 F. Supp. 2d 223 (E.D.N.Y. 1998) …………………………………………… 13

*London v. Berkshire Life Ins. Co.*,
    71 F. App'x 881 (2d Cir. 2003) …………………………………………….. 13

*McBride v. BIC Consumer Mfg. Co., Inc.*,
    583 F.3d 92 (2d Cir. 2009) …………………………………………………… 11

*McGrail v. Equitable Life Assurance Soc'y*,
    292 N.Y. 419 (1944) ……………………………………………………….. 13

*Miner v. Clinton Cnty.*,
    541 F.3d 464 (2d Cir. 2008) ………………………………………………… 12

*Panther v. Synthes (U.S.A.)*,
    371 F. Supp. 2d 1267 (D. Kan. 2005) ……………………………………… 14

*Paul Revere Life Ins. Co. v. Bavaro*,
    957 F. Supp. 444 (S.D.N.Y. 1999) …………………………………………… 18

*Provident Life Accident Ins. Co v. Fleischer*,
    26 F. Supp. 2d 1220 (S.D. Cal. 1998) ……………………………………….. 19

*Ragins v. Hosp. Ins. Co., Inc.*,
    22 N.Y.3d 1019 (2013) ……………………………………………………… 16

*Schmidlkofer v. Directory Distrib., Assocs.*,
    107 F. App'x 631 (6th Cir. 2004) …………………………………………….. 14

*Schuster v. Paul Revere Life Ins. Co.*,
    00 Civ. 997 (JSM), 2001 U.S. Dist. LEXIS 20594 (S.D.N.Y. Dec. 12, 2001) ….. 13

*Stewart v. Penn Mut. Life Ins. Co.*,
    97 Civ. 5779 (AKH), 1999 U.S. Dist. LEXIS 20025 (S.D.N.Y. Dec. 29, 1999) … 13

*SCR Joint Venture L.P. v. Warshawsky*,
    559 F.3d 133 (2d Cir. 2009) ………………………………………………… 12

*Tsoulas v. Liberty Life Assurance Co.*,
    397 F. Supp. 2d 79 (D. Me. 2005), *aff'd*, 454 F.3d 69 (1st Cir. 2006)…………… 15

*United States Fidelity & Guarantee Co. v. Annunziata*,

iv

      67 N.Y.2d 229 (1986) ………………………………………………………  16

*Uno v. Provident Life & Accident Ins. Co.*,
      221 Ore. App. 661 (Oregon, 2008) …………………………………….. 25

*Weissman v. First UNUM Life Ins. Co.*,
      44 F. Supp. 2d 512 (S.D.N.Y. 1999) ……………………………………… 18

*Westview Assoc. v. Guaranty Nat'l Ins. Co.*,
      95 N.Y.2d 334 (2000) …………………………………………………. 16

*Zenk v. Paul Revere Life Ins. Co.*,
      171 F. Supp. 2d 929 (D. Minn. 2000) …………………………………… 18

S<small>TATUTES</small>

Fed. R. Civ. P. 56  ………………………………………………………… 11

## PRELIMINARY STATEMENT

Plaintiff Denny Martin ("Plainitff" or "Martin") hereby submits this memorandum of law in opposition to the motion for summary judgment filed by defendant Berkshire Life Insurance Company of America ("Berkshire").

Plaintiff, a medical doctor who has been diagnosed with debilitating trigeminal neuralgia and cervical myelopathy, commenced this action seeking to recover benefits under occupational disability and overhead expense disability policies issued to him by Berkshire.  Berkshire argues that Plaintiff is not entitled to coverage under the occupational disability policies because, in addition to his medical disability, Plaintiff also purportedly suffers from a "legal disability" – namely, an order barring him from billing Medicare and Medicaid, that purportedly prevents him from carrying on his occupation even if he were not medically disabled.  That argument, however, does not stand up to the barest scrutiny.  Nothing, other than his medical condition, prevents Plaintiff from continuing to treat patients who self-pay or utilize private insurance.  Berkshire's argument is particularly nonsensical given that, even before his disability, Plaintiff derived a significant amount of revenue from patients who self-paid or utilized private insurance.

Berkshire also argues that Plaintiff cannot collect benefits under his overhead disability policies because those policies only afford coverage for the expenses of operating businesses.  Yet under the crystal-clear terms of Berkshire's own policies, Plaintiff's businesses *are* still operating.

Accordingly, Plaintiff respectfully requests that Court deny Berkshire's motion for summary judgment in its entirety.

## FACTS

Plaintiff Denny Martin continuously practiced medicine as a licensed medical doctor from 2009 until his medical disability forced him to stop in October 2019.  Plaintiff was the owner of

several very successful medical care companies.   (Plaintiff's Counter-Statement of Material Undisputed Facts ("CSMF") at ¶¶ 1-2.)

In or around 2013, Plaintiff started Denny Martin MD PC, which provided medical care in facilities like nursing homes and assisted living facilities, along with performing various bedside procedures.  Plaintiff was—and still is—the sole, 100% owner of Denny Martin MD PC.  (CSMF at ¶3.)  When he opened the company, Plaintiff employed one nurse practitioner and two administrative assistants, and had between 100 and 150 patients.  Within a year, he had hired an additional physician assistant and the practice had grown to approximately 400 patients.  By 2015, approximately 70 to 80 percent of the practice's patients used Medicare or Medicaid, while the remainder used either private insurance or self-paid.  (CSMF at ¶ 4.)

In or around 2014, Plaintiff started AM PM Medical PC ("AM PM Medical"), which provided medical care in patients' homes.  Plaintiff was—and still is—the sole, 100% owner of AM PM Medical.  (CSMF at ¶ 5.)  Plaintiff started to receive referrals at a rate of nearly 50 new patients per week and the company grew extremely rapidly.  By 2017, AM PM Medical had approximately 6,000 patients and thereafter continued to grow by an average of 1,500 active new patients each year.  To keep up with the company's growth, Plaintiff hired medical providers and administrative staff at an extremely rapid rate.  (CSMF at ¶ 6.)  By the end of 2017, AM PM Medical employed a staff of between 25 and 30 employees.  At that time, approximately 70 to 80 percent of the practice's patients used Medicare or Medicaid, while the remainder used either private insurance or self-paid.  (CSMF at ¶ 7.)

In or around late 2017, Plaintiff started Transitional Care Medical Services PLLC, which provided services to patients who had recently been discharged from hospitals or skilled nursing

facilities, and AM PM Urgent Care, which provided medical services in an office setting.  (CSMF at ¶ 8.)

All of the employees for these companies (along with Denny Martin MD PC) were employed and credentialed by all of the entities, but paid through AM PM Medical for the simplification of accounting purposes.  (CSMF at ¶ 9.)  By 2019, AM PM Medical had a staff of 60 employees on payroll, including approximately two dozen medical providers, and further utilized 20 independent contractors.  At that time, Denny Martin MD PC had approximately 600 patients, AM PM Medical had approximately 9,000 patients, Transitional Care had approximately 1,500 patients, and AM PM Urgent Care had approximately 150 visits per day.  By 2019, approximately 70 to 80 percent of the practice's patients used Medicare or Medicaid, while the remainder used either private insurance (1,724 patients) or self-paid.  Almost all of AM PM Urgent Care's patients were self-paid.  (CSMF at ¶ 10.)

Plaintiff left the management of these companies to administrative employees, while he spent his own time treating patients.  In 2018 and 2019, Plaintiff would typically begin work each day between 7:00am and 7:30am.  He would treat patients at Concourse Rehab & Nursing Center for approximately three hours on behalf of Denny Martin MD PC.  Most of the patients that he would treat were extremely ill, and Plaintiff was responsible for handling their most acute problems.  For the next eight hours, Plaintiff would then make house calls to patients on behalf of AM PM Medical and Transitional Care, and treat patients in AM PM Urgent Care's two clinics. (CSMF at ¶ 11.)

Berkshire has cited the Current Procedural Terminology ("CPT") codes produced by Plaintiff for the period of June 2018 through August 2019 as evidence that Plaintiff's own billed charges for patient care accounted for only 1.3% of the total billed charges for his companies.  That

number, however, is simply incorrect.  In fact, Plaintiff's billed charges for that time period were approximately $2 million, which constituted in excess of 5% of the companies' total billed charges. In addition, Plaintiff's work on behalf of AM PM Urgent Care is not reflected in his billed insurance charges, as AM PM Urgent Care only treated patients who self-paid. (CSMF at ¶ 12.)

Starting in the Spring of 2019, Plaintiff began experiencing the first manifestations of trigeminal neuralgia and cervical myelopathy in the form of right sided facial and jaw pain, along with neck pain and clumsiness of his hands.  As the pain progressively worsened, Plaintiff found that he was unable to continue his full work schedule.  (CSMF at ¶ 13.)  As is evident in the chart below, Plaintiff's billed charges in June, July, and August precipitously declined as he was unable to safely and effectively independently treat patients.



(CSMF at ¶ 14.)  Witnesses have testified that in May and June 2019, Plaintiff appeared visibly unwell and stopped coming into the office as a result of his health condition.  According to their recollection, at that time it became difficult for him to visit patients in buildings that lacked elevators, where he would have to climb the stairs to reach their apartments.  (CSMF at ¶ 15.)  To deal with the pain and other symptoms, Plaintiff initially treated himself with increasing dosages and frequency of Tylenol, Motrin, and cold facial compresses.  (CSMF at ¶ 16.)

In August 2019, Plaintiff was seen by a dental hygienist at Dr. Gregg Monterosso's office and was able to rule out the possibility that his pain was the result of a dental issue.  (CSMF at ¶ 17.)  Plaintiff next attempted to schedule an appointment with a general neurologist, Drs. Berk, Cardiel, and Levitan, who Plaintiff knew professionally to be very reputable, but found that there was a three- to four-month waiting period.  Plaintiff subsequently obtained an appointment with Dr. Christine Stahl at the Movement Disorders Clinic at NYU Hospital for October 8, 2019.[1] (CSMF at ¶ 18.)

Plaintiff independently treated his last patient on August 28, 2019.  After that date, his only activity as a doctor was signing off on admissions and discharges for mid-level providers at Concourse Rehab and Nursing pursuant to facility policy and requirements.  Plaintiff's last patient sign-off was on September 18, 2019.  (CSMF at ¶ 19.)

On September 26, 2019 Plaintiff was arrested by the Department of Health and Human Services and charged with Health Care Fraud under 18 U.SW.C. 1347.  Plaintiff was released by the Hon. Magistrate Robert M. Levy pursuant to an Order Setting Conditions of Release and

---

[1] At Dr. Stahl's office, Plaintiff's domestic partner filled out a patient intake form on his behalf and indicated on the form that he was working full time, thinking that the question was referring to Plaintiff's activities at the onset of his symptoms.  (*See* Affidavit of Hayley Voiers dated August 31, 2022.)

Appearance Bond (the "Release Order").  The Release Order provided that, as a condition of Plaintiff's release, he was no longer permitted to "submit any claims directly [or] indirectly to Medicaid and Medicare."  (CSMF at ¶ 20.)

Beginning in early October, given his rapidly declining health, Plaintiff began the process of winding down his practice.  (CSMF at ¶ 21.)

On October 8, 2019, Dr. Stahl diagnosed Plaintiff with right-sided trigeminal neuralgia and ordered an MRI of the brain and of the cervical spine, which confirmed her diagnosis of trigeminal neuralgia but also raised questions about the possibility that Plaintiff might also be suffering from cervical myelopathy.  Dr. Stahl started Plainitff on medication for his trigeminal neuralgia.  (CSMF at ¶ 23.)

Dr. Stahl referred Plaintiff to neurosurgery for cervical myelopathy and scheduled Plaintiff an appointment with Drs. Berk, Cardiel, and Levitan.  Even with that scheduling assistance, however, Plaintiff was still only able to see a junior neurologist at the practice.  Plaintiff subsequently scheduled a consultation with neurosurgery and pain management at Mt. Sinai. (CSMF at ¶ 24.)

By the end of October, now encumbered by the debilitating side effects of his medication— including severe dizziness, drowsiness, and visual problems—Plaintiff laid off most of his medical staff.  A small administrative staff continued working at his medical practices until the end of December to handle calls from patients.  (CSMF at ¶ 25.)

On November 13, 2019, Plaintiff saw Drs. Kahn and Caridi.  Dr. Caridi recommended that Plainitff undergo a c4/6 ACDF (anterior cervical discectomy and fusion) for his cervical myelopathy.  Plaintiff, aware of the risks and complications of such surgery, declined to proceed. Dr. Caridi then referred Plaintiff to Dr. Shrivastava, who recommended a craniotomy and

microvascular decompression of his trigeminal nerve for his trigeminal neuralgia.  Plaintiff, again aware of the risks and complications of such treatment, declined.  Dr. Shrivastava also ordered a 7T MRI of Plaintiff's brain, which in fact revealed early bifurcation of the right superior cerebellar artery as the cause of Plaintiff's trigeminal neuralgia.  (CSMF at ¶ 26.)

Plaintiff elected to treat his conditions conservatively with high dosages of neuropathic medication, which had profound and significant side effects including dizziness, balance issues, drowsiness, blurry vision, double vision, and cognitive deficits.  (CSMF at ¶ 27.)

While Plaintiff's companies ceased providing medical services by the end of December 2019, his entities have never been dissolved and, in fact, remain in operation.  (CSMF at ¶ 28.) Denny Martin MD PC owned—and still owns—an apartment at 1641 Third Avenue, Unit 2A, New York, New York 10128, which it had originally purchased as a commercial property.  As of January 2020, it was paying a mortgage on that property at the rate of $10,928.20/month and real estate taxes of $23,078.32 per year, along with a monthly maintenance of $1,350.  (CSMF at ¶ 29.) As of January 2020, Denny Martin MD PC and AM PM Medical jointly had several outstanding commercial loans, one in the amount of $1,264,211.03 at 4.09% interest, another in the amount of $350,000 at 6.8% interest, and another in the amount of $252,407.30 at 5.54% interest.  Denny Martin MD PC and AM PM Medical also jointly had a lease at 930 Grand Concourse, Bronx, New York 10451.  As of January 2020, monthly rent on that property was $11,723.12.  (CSMF at ¶ 30.) In addition, Martin Enterprises—a company started by Plaintiff in 2017 to hold real estate and provide operational support for his practice—owned an office at 350 West 58th Street, New York, New York, 10019, on which, as of January 2020, it was paying a mortgage at the rate of $7,630.54 per month and real estate taxes of $26,003.24, along with a monthly maintenance fee of around $2,500.  At that time, Martin Enterprises also had an outstanding commercial loan in the amount

of $1,095,034.69 at 4.74% interest, along with an SBA loan in the amount of $898,446.  (CSMF at ¶ 31.)

Between 2011 and 2018, Defendant Berkshire Life Insurance Company issued five Individual Disability policies to Plaintiff (Z2195350, Z2195360, Z9651050, Z9651060, and Z9836160).  Each of the policies provides as follows:

> **Total Disability Benefit**
> When You are Totally Disabled, We will pay the Monthly Indemnity as follows:
> - You must become Totally Disabled while the Policy is in force.
> - You must satisfy the Elimination Period.
> - After You have satisfied the Elimination Period, Monthly Indemnity will be payable at the end of each month while You remain Totally Disabled.
> - Monthly Indemnity will stop at the end of the Benefit Period or, if earlier, on the date You are no longer Totally Disabled.

The policies each define the term "Totally Disabled" as

> Total Disability or Totally Disabled means that, solely due to Injury or Sickness, You are not able to perform the material and substantial duties of Your Occupation.
>
> You will be Totally Disabled even if You are Gainfully Employed in another occupation so long as, solely due to Injury or Sickness, You are not able to work in Your Occupation.
>
> Working an average of more than 40 hours in a week, in itself, is not a material and substantial duty.

Four of the policies further define the term "Your Occupation" as:

> Your Occupation means the occupation (or occupations, if more than one) in which You are Gainfully Employed during the 12 months prior to the time You become Disabled.
>
> If You have limited Your Occupation to the performance of the material and substantial duties of a single medical specialty or to a single dental specialty, We will deem that specialty to be Your Occupation.

Policy number Z9836160, however, has a slightly different definition of the term:

> Your Occupation means the occupation (or occupations, if more than one) in which You are Gainfully Employed during the 12 months prior to the time You become Disabled. Your Occupation does not mean a specific job title, designation, industry, or job with a certain employer.

(CSMF at ¶ 32.)

Between 2015 and 2018, Berkshire also issued three Overhead Expense Disability ("OED") policies to Plaintiff (Z3141490, Z9829350, and Z3949760). Each of the OED Policies provide that

> While You are Totally Disabled, We will pay monthly benefits if each of the following conditions are met:
> - You become Disabled while the Policy is in force;
> - You satisfy the Elimination Period; and
> - Proof of Loss is provided to Us.
> After You satisfy the Elimination Period, at the end of each month that You remain Totally Disabled, We will pay the Policyowner the Reimbursable Expense Amount up to the Available Benefit.

The OED Policies provide that the "Reimbursable Expense Amount" means "the Covered Overhead Expenses You incur and pay for the claimed month less Prior Coverage for that month."

They further provide the following definition for "Covered Overhead Expenses":

> Covered Overhead Expenses means the normal, necessary and customary expenses that You incur and pay in the continued operation of Your Business.
>
> In the event of multiple owners or joint occupancy, Covered Overhead Expenses means that part of such normal, necessary and customary expenses for which You are responsible.
>
> Covered Overhead Expenses must be deductible for federal income tax purposes. Covered Overhead Expenses include:
>
> - real estate and property taxes;
> - utilities, such as heat, water, electricity and telephone;
> - laundry, janitorial and maintenance services;

- salaries and employer-paid benefits of employees who have no ownership interest in Your Business and who are not members of Your profession;
- property, liability, malpractice and other business insurance premiums that have not been waived due to Your Disability;
- professional, trade and association dues;
- licensing fees, including continuing education costs required to maintain such professional license;
- legal and accounting fees paid except those that are directly related to the termination or sale of Your Business;
- billing and collection fees;
- rent or lease payments for space which You occupy and use in the continued operation of Your Business;
- rent or lease payments for motor vehicles, equipment, fixtures, furniture or other assets used in the continued operation of Your Business if You have no direct or indirect ownership in the assets;
- scheduled installment payments of interest on debt; and
- depreciation or scheduled installment payments of principal on debt for which You were liable before You became Disabled, but not both, regardless of whether these are deductible for federal income tax purposes. The choice must be made only once for each separate Disability at the time the claim begins. The amount of depreciation allowed will be that used for federal income tax purposes. The amount of principal will not be more than that paid under a plan of scheduled installment payments which begin before the start of Disability.

**Expenses Not Covered**
Covered Overhead Expenses do not include:

- that portion of normal and customary business expenses which is the obligation of any person other than You;
- any expense for which You were not normally and customarily liable on a periodic basis prior to the start of Disability;
- any other expenses that have been waived, reimbursed or are reimbursable from any other source;
- any prepayment or advance payment of a Covered Overhead Expense;
- any salary, fee, draw, advance, benefit or other remuneration for a member of Your Family who was not a paid employee during the 60 days immediately prior to Your Disability;
- income taxes or self-employment taxes;
- any expense for equipment, motor vehicles, fixtures, furniture or other assets purchased or leased after the date You became Disabled;
- the cost of inventory, merchandise, products, goods and services directly attributable to generating revenue;
- the cost of implements of Your profession;

10

- the cost of supplies, fees and expenses passed on to Your clients; and
- the cost of gifts, charitable donations, meals and entertainment.

(CSMF at ¶ 33.)  The OED Policies also define "You and Your" as "the person insured, who is named in the Schedule Page" (i.e., Plaintiff) and "Business" as "an entity, company or professional practice in which You have an ownership interest."  (CSMF at ¶ 34.)

On or about October 12, 2019, Plaintiff submitted a Disability Claimant's Statement Description of Occupation form to Berkshire.  Berkshire denied Plaintiff's claim and Plaintiff was forced to commence this action via Summons and Complaint dated November 10, 2020.  (CSMF at ¶ 35.)

Over the course of this litigation, Plaintiff's experts, Drs. Hausknecht and Krishna, confirmed Plaintiff's diagnosis of trigeminal neuralgia and cervical myelopathy, and further opined that as a result of those conditions and the debilitating side effects of the medication that Plaintiff has been prescribed, Plaintiff is unable to perform the material and substantial duties of any occupation—including that of medical doctor.  (CSMF at ¶ 36.)

On or about July 12, 2022, after an extensive administrative process including a hearing before ALJ Lori Romeo, the Social Security Administration issued a "fully favorable" decision finding that Plaintiff was disabled as of October 1, 2019 and awarding him Social Security disability benefits.  (CSMF at ¶ 37.)

## ARGUMENT

### A. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is warranted only where, construing all the evidence in the light most favorably to the non-movant and drawing all reasonably inferences in that party's favor, 'there is no genuine issue as to any material fact and. . . . the movant is entitled to judgment as a matter of law.'" *McBride v. BIC Consumer Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting Fed. R.

Civ. P. 56(c)).  "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'" *Impax Labs., Inc. v. Turing Pharms. AG*, 2017 U.S. Dist. LEXIS 164133, at *19 (S.D.N.Y. Sep. 28, 2017). A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009).

In deciding the motion, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Green v. Town of East Haven*, 952 F.3d 394, 406 (2d Cir. 2020) (*quoting Kessler v. Wetchester Cnty Dep't of Social Svcs.*, 461 F.3d 199, 206 (2d Cir. 2006)).  The burden of demonstrating that there is no genuine dispute as to any material fact lies with the moving party. *Miner v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). To defeat summary judgment, "'all that is required [from the non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006).

## B. <u>PLAINTIFF IS NOT "LEGALLY DISABLED" FROM ENGAGING IN HIS OCCUPATION</u>

"Disability insurance policies generally fall into two classes: occupational insurance, which provides coverage if the insured is unable to pursue the particular occupation in which he was previously engaged; and general insurance, which provides coverage only if the insured is unable to pursue any occupation." *Dawes v. First UNUM Life Ins. Co.*, 851 F. Supp. 118, 121-22 (S.D.N.Y. 1994) (citing 15 Couch on Insurance 2d § 53.45 (1983)).

Berkshire issued five (5) policies of occupational insurance to Plaintiff.  Each of the policies provides that Berkshire will pay Plaintiff the policy's monthly indemnity if he becomes "Totally Disabled while the Policy is in force."  The policies further define the term "Totally

Disabled" to mean that "solely due to Injury or Sickness, You are not able to perform the material and substantial duties of Your Occupation."

Thus, to be entitled to benefits under the policies, Plaintiff need only demonstrate that he is unable to perform "the material and substantial duties" of his occupation. "The application of the 'material and substantial duties' language in occupational disability policies is well-settled in New York." *London v. Berkshire Life Ins. Co.*, 71 F. App'x 881, 883-84 (2d Cir. 2003). The Court is required to

> [look] to the professional activities in which the insured was regularly engaged at the time of the onset of the insured's disability. If a claimant is able to perform the duties of a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties, he is not totally disabled.

*Id.* (*quoting Klein v. National Life of Vt.*, 7 F. Supp. 2d 223, 227 (E.D.N.Y. 1998)).

Plaintiff has submitted the expert reports of Dr Hausknecht and Dr Krishna attesting to the details of his disability and confirming that it prevents him performing the material and substantial duties of his occupation. Nevertheless, "[u]nder New York law, 'it is generally a question for the jury to determine whether a policyholder is totally disabled within the meaning of the policy provision.'" *Schuster v. Paul Revere Life Ins. Co.*, 00 Civ. 997 (JSM), 2001 U.S. Dist. LEXIS 20594, at *7 (S.D.N.Y. Dec. 12, 2001) (*quoting Godesky v. First Unum Life Ins. Co.*, 239 A.D.2d 547, 548 (2d Dep't 1997)); *Stewart v. Penn Mut. Life Ins. Co.*, 97 Civ. 5779 (AKH), 1999 U.S. Dist. LEXIS 20025, at *4 (S.D.N.Y. Dec. 29, 1999); *see also McGrail v. Equitable Life Assurance Soc'y*, 292 N.Y. 419, 425, 55 N.E.2d 483, 486 (1944).

Here, however, Berkshire argues that—even if Plaintiff is "Totally Disabled" within the meaning of the policies—Plaintiff is not entitled to coverage because Plaintiff suffers from a pre-

existing "legal disability" that is not covered by the policies.  That argument, quite simply, does not stand up to scrutiny.  Accordingly, Berkshire's motion for summary judgment must be denied.

1. **Berkshire's Narrow Characterization of Plaintiff's Occupation Is Without Legal Basis**

Berkshire's argument that Plaintiff suffers from a legal disability that prevents him from performing his occupation is premised upon the dubious assertion that Plaintiff's "Occupation" was not simply that of a treating physician—rather his occupation "in the twelve months prior to his claim for disability was that of a medical director of a medical practice focused on a clientele insured by federally funded insurance." (Berkshire MOL at p. 9.)

Berkshire's extremely narrow definition of Plaintiff's occupation is in brazen conflict with the well-settled definition of the term "occupation" utilized by courts across the country. (Berkshire, tellingly, does not address any of this caselaw in its memorandum of law.)

Courts looking at similar language have repeatedly held that own-occupation disability policies insure the insured's ability to practice his occupation, not his job.  The term "occupation" is generally considered to mean "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties."  *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (*quoting Dawes v. First UNUM Life Ins. Co.*, 851 F. Supp. 118, 121-22 (S.D.N.Y. 1994)) (interpreting the term "regular occupation").  The term is "defined more narrowly than any means for making a living, **but it is not limited to the insured's particular job**."  *Id.* (emphasis added); *see also, e.g., Schmidlkofer v. Directory Distrib., Assocs.*, 107 F. App'x 631, 633 (6th Cir. 2004) ("Many courts have upheld a plan administrator's interpretation of 'regular occupation' as meaning a general occupation rather than a particular position with a particular employer."); *Panther v. Synthes (U.S.A.)*, 371 F. Supp.

14

2d 1267, 1278 (D. Kan. 2005) (concluding that a plan administrator "properly defined 'own occupation' to mean one's occupation as it is performed routinely in the labor market, rather than how a particular employee performed his or her job for a particular employer"); *Tsoulas v. Liberty Life Assurance Co.*, 397 F. Supp. 2d 79, 97 (D. Me. 2005), *aff'd*, 454 F.3d 69 (1st Cir. 2006)) ("[c]ourts have applied the term, 'own occupation,' generally and have evaluated disability in light of the usual duties of that occupation, not on ad hoc peculiarities of a specific job or the requirements of a particular employer..."); *Hanser v. Ralston Purina Co.*, 821 F. Supp. 473, 478 (E.D. Mich. 1993) ("defendant's interpretation of the term… 'regular occupation' as meaning the type of work which a covered employee is trained to perform rather than the specific job at which the employee was working...is a rational interpretation supported by the plain meaning of the words").

Thus, courts have proposed

> various ways to determine what positions fall within a claimants "regular occupation" under the foregoing description. One method would be to have a vocational evaluation performed to compare the character, duties and training requirements of a claimant's job with various other jobs in order to define the parameters of a claimant's "regular occupation." Another method would be to determine which of the D.O.T. occupational titles covers the claimant's previous job.

*Dionida v. Reliance Standard Life Ins. Co.*, 50 F. Supp. 2d 934, 939 (N.D. Cal. 1999).

The Policies issued by Berkshire to Plaintiff either explicitly or implicitly acknowledge this definition of the term "occupation."  The Policies each define the term "Your Occupation" as "the occupation (or occupations, if more than one) in which You are Gainfully Employed during the 12 months prior to the time You become Disabled."  Policy number Z9836160 then specifically provides that "Your Occupation does not mean a specific job title, designation, industry, or job with a certain employer."

The other four policies instead go on to specify that if "You have limited Your Occupation to the performance of the material and substantial duties of a single **medical specialty** or to a single **dental specialty**, We will deem that specialty to be Your Occupation." (Emphasis added.) Thus, an insured's occupation might be "oncologist" instead of "doctor." But by limiting the extent to which an insured's "occupation" can be narrowed down to a specific "medical specialty," these four Policies likewise reject the sort of occupational definition proposed here by Berkshire—that of "a medical director of a medical practice focused on a clientele insured by federally funded insurance." (Berkshire MOL in Support at p. 9.)

To the extent that there are any ambiguities in the language of the Policies—and there is not—it is well settled that "ambiguities in an insurance policy are to be construed against the insurer." *Dean v. Tower Ins. Co. of New York*, 19 N.Y.3d 704, 708 (2012); *accord Ragins v. Hosp. Ins. Co., Inc.*, 22 N.Y.3d 1019, 1022 (2013); *see also Blasbalg v. Mass. Cas. Ins. Co*., 962 F. Supp. 362, 368 (E.D.N.Y. 1997) ("Disability policies are to be given practical application, consistent with New York's declared policy that 'the terms of an insurance policy will receive the construction most favorable to the insured.'"). Thus, "[i]f the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer." *Westview Assoc. v. Guaranty Nat'l Ins. Co.*, 95 N.Y.2d 334, 340 (2000). These rules of construction apply broadly to all issues of interpretation of an insurance policy's language. *See United States Fidelity & Guarantee Co. v. Annunziata*, 67 N.Y.2d 229, 232 (1986) ("The policy must, of course, be construed in favor of the insured, and ambiguities, if any, are to be resolved in the insured's favor and against the insurer.").

Looking at both the language of the Policies and the well settled caselaw, Berkshire's definition might potentially describe Plaintiff's **job**, but it certainly does not describe Plaintiff's **occupation**.

### 2. Plaintiff's Occupation Was "Doctor," Not "Medical Director"

Berkshire contends that Plaintiff's occupation was as a medical director, and not a doctor. Berkshire premises its argument upon two assertions: (1) Plaintiff had a staff of 60 employees and 20 independent contractors; and (2) while Plaintiff testified that he spent between 8 and 10 hours per day treating patients, Plaintiff's CPT code data showed that his own medical work comprised only 1.3% of the billings of his practice.  (Berkshire MOL in Support at p. 9.)

As explained above, however, Plaintiff delegated the management of his practice to a full time office manager.  Further, Berkshire's analysis of Plaintiff's CPT code data is simply incorrect. In the period of June 2018 through August 2019, Plaintiff's billed charges were approximately $2 million, which constituted in excess of 5% of his companies' total billed charges.  Moreover, this analysis does not even include medical services performed by Plaintiff for patients who self-paid.

Thus, the record is clear that Plaintiff's occupation in the twelve (12) months prior to his disability was that of "medical doctor."

In any event—whether Plaintiff is a doctor or a medical director—the pertinent question is the same: Would the prohibition on Plaintiff billing Medicaid and Medicare prevent him from working in "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties."  *Kinstler*, 181 F.3d at 252.  The answer is clearly "no."

### 3. Plaintiff's Purported Legal Disability Does Not Prevent Him from Either Practicing Medicine or Working as a Medical Director

17

Berkshire contends that the prohibition on Plaintiff billing Medicaid and Medicare is a "legal disability" that would prevent him from practicing medicine as a doctor.  That is simply not true.

A "legal disability" is one "in which the law does not permit a person to engage in his or her profession."  *Jacobs v. Northwestern Mut. Life Ins. Co.*, 103 A.D.3d 78 (2d Dep't 2012).  As examples, Berkshire cites *Weissman v. First UNUM Life Ins. Co.*, 44 F. Supp. 2d 512 (S.D.N.Y. 1999) and *Paul Revere Life Ins. Co. v. Bavaro,* 957 F. Supp. 444 (S.D.N.Y. 1999).  In both cases, the insured's legal disability was one that would totally prevent the insured from engaging in his occupation.  In *Weissman*, the insured was permanently barred from acting as a securities broker.  In *Paul Revere*, the insured's insurance license was revoked.  *See also Brumer v. Nat'l Life*, 874 F. Supp. 60, 64 (E.D.N.Y. 1995) (insured had a "legal disability" where his medical license was suspended); *Gassler v. Monarch Life Ins. Co.*, 276 A.D.2d 585, 586 (2d Dep't 2000) (insured had a "legal disability" where license to practice podiatry was revoked).[2]

Here, however, Plaintiff has not been barred from practicing medicine.  Plaintiff is prohibited only from billing Medicare and Medicaid.  The Release Order does not prevent Plaintiff from submitting claims to private insurance, nor does it prevent Plaintiff from treating patients who self-pay.  Plaintiff's license to practice medicine has not been suspended.  Simply put, nothing (other than his medical disability) prevents Plaintiff from continuing to practice as a doctor.  *See Zenk v. Paul Revere Life Ins. Co.*, 171 F. Supp. 2d 929, 935 (D. Minn. 2000) (insured doctor was not "legally disabled" where the state licensing board determined that he "could continue to

---

[2] Berkshire cites to *Jacobs* for the proposition that a "practice restriction" can qualify as a "legal disability."  A billing restriction, however, is not the same thing as a practice restriction.  Berkshire has not identified any caselaw to support the contention that a billing restriction would qualify as a "legal disability."

practice medicine so long as he agreed to abide by several enumerated conditions and restrictions";
the insured only became "legally disabled" when he voluntarily surrendered his medical license).

Even if the Court were to credit Berkshire's assertion that Plaintiff's true occupation was
that of "medical director," the situation is the same.  Medical directors are administrators who
oversee medical facilities and supervise other medical providers—they do not bill insurance
carriers for their own services.  (Martin Aff. at ¶ 44.)  And even were that not the case, nothing
(other than his medical disability) would prevent Plaintiff from working at a medical facility that
only takes private insurance, or one that does not take insurance at all.

Berkshire argues that the Release Order would prevent Plaintiff from continuing his
practice because the vast majority or his existing patients utilize Medicare or Medicaid.  Had
Plaintiff not suffered from his debilitating medical condition, however, Plaintiff had several
professional options available to him after being prohibited from Medicare and Medicaid: (a)
Plaintiff could have sold his practice and taken a salaried position as a doctor or medical director
in another hospital or medical practice; (b) Plaintiff could have sold his practice and opened a new
practice focusing on patients who do not have federally funded medical insurance; (c) Plaintiff
could have downsized his existing practice and shifted to exclusively treating patients who do not
have federally funded medical insurance; or (d) Plaintiff could have continued to solely run his
two urgent care clinics, which provided services to approximately 150 self-pay patients daily.  All
of these options would have permitted Plaintiff to continue practicing his occupation.

Berkshire also refers the Court to *Provident Life Accident Ins. Co v. Fleischer*, 26 F. Supp.
2d 1220 (S.D. Cal. 1998).  That case, however, is inapposite.  In *Fleischer*, the insured's own
physicians testified that his disability (depression) arose directly from the criminal proceedings
against him.  "Both physicians stated that Fleischer's depression would end when his legal

difficulties ended and when he was released from prison. Dr. Matlin specifically testified that when Fleischer's depression ended, he would be able to resume his occupational duties." *Id.* at 1226. On this basis, the court found that the insured's total disability "resulted from a legal consequence—his incarceration resulting from his criminal activity—rather than from a factual disability." *Id.* at 1223.

In contrast, Berkshire has not presented any evidence here that Plaintiff's medical condition is a direct result of his legal troubles. To the contrary, several witnesses have testified that Plaintiff was already visibly unwell months before he even learned of the criminal investigation that led to his arrest. (CSMF ¶ 15.)

### 4. **Plaintiff's Purported Legal Disability Would Not Prevent Him from Continuing His Medical Practice**

As noted above, the pertinent question is whether the prohibition on Plaintiff billing Medicaid and Medicare would prevent him from working in "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Kinstler*, 181 F.3d at 252. Thus, Plaintiff is not required to demonstrate that he could have continued to work in the exact same **job** that he worked in at the time of his disability; rather, Plaintiff need only show that (absent his medical disability) he could have continued to work as a doctor. Nevertheless, the record is clear that Plaintiff could have continued to operate his medical practice even without the ability to bill Medicaid and Medicare.

During the twelve months prior to his disability, Plaintiff *did not* exclusively treat Medicare and Medicaid patients. 20 to 30 percent of Plainitff's patients utilized private insurance or self-paid. In fact, almost all of AM PM Urgent Care's patients—approximately 150 per day—self paid. By 2019, Plaintiff had non-Medicare/Medicaid revenues in excess of $200,000 per month. (CSMF at ¶ 12.) While it is certainly true that Plaintiff could not have continued to operate his practice at

the size it had grown without billing Medicare and Medicaid, Plaintiff could have laid off staff and downsized his operations to accommodate the newly reduced patient load.  It may have taken time, but Plaintiff would have been able to rebuild his practice with a new base of patients.

     **5.**   **<u>Plaintiff's Medical Disability Commenced Prior to his Purported Legal Disability</u>**

Plaintiff is also entitled to coverage under the disability policies because his medical disability commenced prior to his purported legal disability.

"When an insured has a legal disability, but also claims a factual disability, the determination of coverage rests on three factors: first, whether the claimed factual disability is medically bona fide; second, whether its onset actually occurred before the legal disability; and, third, whether the factual disability actually prevented or hindered the person seeking disability benefits from engaging in his or her profession or occupation." *Jacobs v. Nw. Mut. Life Ins. Co.*, 103 A.D.3d 78, 84 (2d Dep't 2012).

Here, Plaintiff first started experiencing the manifestations of trigeminal neuralgia and cervical myelopathy in the Spring of 2019.  As his symptoms worsened, he found that he was unable to safely and independently treat patients.  Plaintiff independently treated his last patient on August 28, 2019.  After that date, his only activity as a doctor was signing off on admissions and discharges for mid-level providers at Concourse Rehab and Nursing pursuant to facility policy and requirements.  His last patient sign-off was on September 18, 2019.

Plaintiff was arrested, and then released pursuant to the release Order, on September 26, 2019.  Accordingly, the onset of Plaintiff's medical disability long preceded his purported "legal disability."  Berkshire's motion for summary judgment must therefore be denied.

     **6.**   **<u>Plaintiff Did Not Continue to Work After His Disability Prevented Him from Engaging in His Occupation</u>**

Berkshire also argues that Plaintiff continued to work past the date of his claimed total disability.  This is simply false.

Berkshire has not presented the Court with **any** evidence that Plaintiff practiced medicine after his symptoms became debilitating and prevented him from safely performing his professional responsibilities.  Again, Plaintiff saw and treated his last patient on August 28, 2019, and stopped signing off on patient admissions and discharges at Concourse Rehab and Nursing on September 18, 2019.  There is absolutely zero evidence that Plaintiff ever practiced medicine again.

Accordingly, Berkshire's motion for summary judgment must be denied.

## C.  PLAINTIFF IS ENTITLED TO BENEFITS UNDER THE OVERHEAD EXPENSE POLICIES

Berkshire further argues that Plaintiff is not entitled to coverage under the OED Policies because his "business" was supposedly "non-operational after the date of his arrest."  (Berkshire MOL at p. 12.)  That argument is factually baseless and legally meritless.  Plaintiff's businesses were operational after the date of his arrest and have continued operating for years thereafter. Accordingly, Plaintiff is entitled to coverage under OED Policies.

Each of the OED Policies provide that

> While You are Totally Disabled, We will pay monthly benefits if each of the following conditions are met:
> - You become Disabled while the Policy is in force;
> - You satisfy the Elimination Period; and
> - Proof of Loss is provided to Us.
>
> After You satisfy the Elimination Period, at the end of each month that You remain Totally Disabled, We will pay the Policyowner the Reimbursable Expense Amount up to the Available Benefit.

The OED Policies provide that the "Reimbursable Expense Amount" means "the Covered Overhead Expenses You incur and pay for the claimed month less Prior Coverage for that month." They further provide the following definition for "Covered Overhead Expenses":

22

Covered Overhead Expenses means the normal, necessary and customary expenses that You incur and pay in the continued operation of Your Business.

…

Covered Overhead Expenses include:

- real estate and property taxes;
- utilities, such as heat, water, electricity and telephone;
- laundry, janitorial and maintenance services;
- salaries and employer-paid benefits of employees who have no ownership interest in Your Business and who are not members of Your profession;
- property, liability, malpractice and other business insurance premiums that have not been waived due to Your Disability;
- professional, trade and association dues;
- licensing fees, including continuing education costs required to maintain such professional license;
- legal and accounting fees paid except those that are directly related to the termination or sale of Your Business;
- billing and collection fees;
- rent or lease payments for space which You occupy and use in the continued operation of Your Business;
- rent or lease payments for motor vehicles, equipment, fixtures, furniture or other assets used in the continued operation of Your Business if You have no direct or indirect ownership in the assets;
- scheduled installment payments of interest on debt; and
- depreciation or scheduled installment payments of principal on debt for which You were liable before You became Disabled, but not both, regardless of whether these are deductible for federal income tax purposes. The choice must be made only once for each separate Disability at the time the claim begins. The amount of depreciation allowed will be that used for federal income tax purposes. The amount of principal will not be more than that paid under a plan of scheduled installment payments which begin before the start of Disability. …

The OED Policies also define "You and Your" as "the person insured, who is named in the

Schedule Page" (i.e., Plaintiff) and "Business" as "an entity, company or professional practice in

which You have an ownership interest."

23

As Berkshire says, the language of the OED Policies is crystal clear.  Once Plaintiff became disabled, after a one-month Elimination Period, he was entitled to reimbursement for "the normal, necessary and customary expenses" that he incurred and paid in the "continued operation" of the companies or entities that he owns.

While Berkshire's argument is that Plaintiff's "business" was his medical practice, that is **not** the definition in the OED Policies.  "Business" is a defined term that includes any "entity, company, or professional practice in which You [Plaintiff] have an ownership interest."

To the extent that there was any ambiguity regarding the meaning of this language—which there certainly is not—it is well-settled that "ambiguities in an insurance policy are to be construed against the insurer."  *Dean v. Tower Ins. Co. of New York*, 19 N.Y.3d 704, 708 (2012); *accord Ragins v. Hosp. Ins. Co., Inc.*, 22 N.Y.3d 1019, 1022 (2013); *see also Blasbalg v. Mass. Cas. Ins. Co*., 962 F. Supp. 362, 368 (E.D.N.Y. 1997).

Plaintiff owns—and has owned at all relevant times—several entities: Denny Martin MD PC; AM PM Medical PC; Transitional Care Medical Services PLLC; AM PM Urgent Care; and Martin Enterprises.  Plaintiff has not sold any of those entities, nor has he dissolved them.  While those entities have stopped providing medical care to patients, that does not mean that they have ceased operation entirely.  Denny Martin MD PC, for example, owns property and continued to pay real estate and property taxes, maintenance fees on his property, and loan repayments.  As detailed in the facts section, above, Plaintiff's other business entities have likewise made similar overhead payments.

The OED Policies are explicit that, "Covered Overhead Expenses" includes:

- real estate and property taxes;
- legal and accounting fees paid except those that are directly related to the termination or sale of Your Business; and

- depreciation or scheduled installment payments of principal on debt for which You were liable before You became Disabled, but not both…

Berkshire refers the Court to several cases that it contends support its position. Yet in nearly every one of those cases, the insured—unlike Plaintiff—either sold or entirely closed up his business. Further, it does not appear that any of those cases addressed the policy language at issue here. None of them, for example, discuss the policy at issue having a specific definition of "Business" like the OED Policies issued by Berkshire. *Compare Uno v. Provident Life & Accident Ins. Co.*, 221 Ore. App. 661 (Oregon, 2008) (looking to Webster's Dictionary for a definition of "business").

Berkshire could have limited coverage under its policies to expenses incurred by Plaintiff in the operation of his medical practice. It did not do so. It instead extended its coverage beyond the Plaintiff's "professional practice" to also include expenses incurred by Plaintiff in the operation of any "entities" or "companies" in which he has an ownership interest. Plenty of "entities" or "companies" exist solely to own real estate. Plaintiff's entities are no different merely because they once also provided medical services.

Accordingly, Berkshire's motion for summary judgment must be denied.

## **CONCLUSION**

For all of the above-mentioned reasons, plaintiff Denny Martin respectfully requests that the Court deny Berkshire's motion for summary judgment in its entirety.

Dated:  Kew Gardens, New York
        August 31, 2022

                              **LIPSIUS-BENHAIM LAW LLP**
                              *Attorneys for Plaintiff Denny Martin*


                              By:  _____
                                   Ira S. Lipsius
                                   Alexander J. Sperber
                              80-02 Kew Gardens Road, Suite 1030
                              Kew Gardens, New York 11415
                              Telephone: 212-981-8440
                              Facsimile: 888-442-0284
                              ilipsius@lipsiuslaw.com
                              asperber@lipsiuslaw.com