UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

DENNY MARTIN,                          Civil Action No. 1:20-cv-10428

          Plaintiff,

     -against-

BERKSHIRE LIFE INSURANCE COMPANY
OF AMERICA,

          Defendant.

-----------------------------------------------------------X


# REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BERKSHIRE'S MOTION FOR SUMMARY JUDGMENT DISMISSING PLAINTIFF DENNY MARTIN'S COMPLAINT


RIVKIN RADLER LLP
Kenneth C. Murphy
Jay D. Kenigsberg
926 RXR Plaza
Uniondale, New York 11556-0926
(516) 357-3000
*Attorneys for Berkshire Life Insurance Company of America*

# TABLE OF CONTENTS

                                                                     **Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ......................................................................................................................... 1

I.     PLAINTIFF HAS NOT MET HIS BURDEN OF ESTABLISHING
       THAT A TRIABLE ISSUE OF MATERIAL FACT EXISTS ........................................... 1

       A.     The Opposition Fails to Refute or Address Berkshire's
               Prima Facie Showing that the Plaintiff's Inability to Work
               Was the Result of a Legal Disability ................................................................ 1

               1.    The Evaluation of Plaintiff's Legal Disability Focuses
                    Upon Plaintiff's Occupation at AM PM Medical PC ........................... 2

               2.    The Definition of "Your Occupation" as Applied to Plaintiff,
                    Supports the Conclusion that Plaintiff's Claim Involves a Legal
                    Disability ............................................................................................... 4

               3.    There is No Evidence Presented that Plaintiff's Alleged Factual
                    Disability Pre-Dated his Legal Disability .............................................. 6

       B.     Plaintiff is Not Entitled to Benefits Under the Overhead
               Expense Policies ................................................................................................ 7

CONCLUSION .................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chenvert v. Paul Revere Life Ins. Co.*,
   No. CIV.03-0330-SLR, 2004 WL 1739718 (D. Del. Aug. 2, 2004) .......................................... 9

*Crawford*
   758 F.3d 473 at 482 (quoting *Hayes v. N.Y.C. Dep't of Corr.*,
   84 F.3d 614, 619 (2d Cir. 1996) ................................................................................................ 8

*Kinstler v. First Reliance Standard Life Ins. Co.*,
   181 F.3d 243 (2d Cir. 1999) ................................................................................................. 4, 5

*Paul Revere Life Ins. Co. v. Klock*,
   169 So. 2d 493 (Fla. Dist. Ct. App. 1964) .............................................................................. 10

*Wilson v. Monarch Life Ins. Co.*,
   971 F.2d 312 (9th Cir. 1992) ................................................................................................... 10

*Winegrad v. N.Y. Univ. Med. Ctr.*,
   64 N.Y.2d 851, 487 N.Y.S.2d 316 (1985) ................................................................................ 1

## PRELIMINARY STATEMENT

Defendant, ("Berkshire"), respectfully submits this Reply Memorandum of Law in further support of its motion, pursuant to Fed. R. Civ. P. 56 (1), for summary judgment dismissing plaintiff Denny Martin's ("Plaintiff" or "Martin") Complaint in its entirety.

As demonstrated in Berkshire's motion for summary judgment, the evidence conclusively establishes that the practice restrictions imposed on Plaintiff following his arrest on charges of healthcare fraud precluded him from practicing his occupation. Those restrictions made it impossible for Plaintiff to continue to operate his business, and it was forced to close down shortly after his arrest.

Plaintiff's opposition fails to defeat Berkshire's motion. It relies on purported facts regarding several companies owned by Plaintiff, that Plaintiff does not identify as an employer in his policy applications or in the Claimant's Statement signed to initiate this claim. Plaintiff describes the "winding down" of his practice without placing it in the context of his arrest and the imposition of practice restrictions in September 2019. Plaintiff omits that because of those restrictions, he was "compelled to close his medical practice," as admitted in his own affidavit filed in another proceeding. Plaintiff's affidavit here contradicts his earlier sworn deposition testimony as well. It is replete with contradictions of the record, bald conclusions of law, and forays into total irrelevance in an attempt to conjure up an issue where none exists.

## ARGUMENT

**I. PLAINTIFF HAS NOT MET HIS BURDEN OF ESTABLISHING THAT A TRIABLE ISSUE OF MATERIAL FACT EXISTS**

**A. The Opposition Fails to Refute or Address Berkshire's Prima Facie Showing that the Plaintiff's Inability to Work Was the Result of a Legal Disability**

Berkshire established that it is entitled to summary judgment on the legal disability issue as it has "tender[ed] facts sufficient to eliminate any material issue of fact." *Winegrad v. N.Y. Univ.*

*Med. Ctr.*, 64 N.Y.2d 851, 487 N.Y.S.2d 316 (1985). In moving for summary judgment, Berkshire presented documentary and testimonial evidence in admissible form establishing a legal disability that pre-dated Plaintiff's purported factual disability.

1. **The Evaluation of Plaintiff's Legal Disability Focuses Upon Plaintiff's Occupation at AM PM Medical PC**

Plaintiff did not represent to Berkshire that his employment extended beyond AM PM Medical PC ("AM PM"). He specifically represented that he owned no other businesses nor works for any other businesses other than AM PM. See, Plaintiff's Disability Claimant's Statement ("Claimant's Statement") (Ex CC to Berkshire's Motion for Summary Judgment ["Berkshire Motion"]). Moreover, to the extent other businesses owned by Plaintiff operated in the healthcare field, they relied on AM PM to exist, as the employees were paid through AM PM (see Plaintiff's Memorandum of Law in Opposition, p. 3). The restrictions barring Plaintiff from billing Medicare/Medicaid shut down AM PM and, like dominoes, all of Plaintiff's related entities ceased operations.

According to the Claimant's Statement, Plaintiff was self-employed by AM PM. Plaintiff further represented that he did not have any ownership interest nor work activities in any other businesses and/or for any other employer. (Claimant's Statement, p. 4, question 8 e). This is consistent with the policy applications that Plaintiff submitted to Berkshire between 2015 and 2018. (Berkshire Motion, Ex F—M). The applications identify Essen Medical Center (not owned by Plaintiff) or AM PM as Plaintiff's employer. Denny Martin MD PC started in 2013, Transitional Medical Services PLLC, AM PM Urgent Care and Martin Enterprises allegedly started in 2017, are not identified in the policy applications.

In short, Plaintiff's "occupation" was tied specifically to his employment with AM PM. After Plaintiff was arrested and was released pursuant to an Order Setting Conditions of Release

2

and Appearance Bond ("Release Order"), he was prohibited from "[submitting] any claims directly [or] indirectly to Medicaid and Medicare." (Berkshire Motion, Ex. Z).

Martin subsequently pleaded guilty to one count of health-care fraud. See, Kenigsberg Reply Declaration, Ex. A, Martin Sentencing Memorandum ("Sentencing Memo"). According to his own Sentencing Memo, "AM PM mostly provided health care services at patients' homes and at nursing homes and assisted living facilities. It had a staff of more than two dozen physicians and nurse practitioners, along with numerous office staff who handled the billing and submissions of claims." The Memo states that AM PM served some 8,000 patients, was one of the largest providers in New York City, and had an annual revenue of $6 million. (Sentencing Memo at p. 2-3). The Sentencing Memo indicates that AM PM "quickly folded" and that Martin is now "deeply in debt."

The abrupt demise of AM PM is supported by the record in this case. At Plaintiff's March 28, 2022 deposition, Plaintiff was shown his August 4, 2020 affidavit submitted in connection with his divorce proceeding. (Berkshire Motion, Ex E pp. 153 - 154). In that affidavit Plaintiff *admitted* his practice restrictions, restrictions that immediately ended his ability to service over 97 percent of the patient population of his entire practice.

Plaintiff's contention that his medical practice survived his arrest, that it could be molded into a new healthcare entity, and he would then service a pool of non-federally funded patients, is pure speculation. The medical practice *was* AM PM. Plaintiff's affidavits in his divorce proceeding and the Sentencing Memo establish that AM PM folded, that it did so "quickly," and that Plaintiff "closed" his medical practice *because of the practice restrictions* imposed by the federal court.

## 2. The Definition of "Your Occupation" as Applied to Plaintiff, Supports the Conclusion that Plaintiff's Claim Involves a Legal Disability

Berkshire concluded that Plaintiff's occupation was that of a medical director in the 12 months prior to his disability claim based on the Current Procedural Terminology ("CPT") codes *produced by Plaintiff* and analyzed by Berkshire. See, Affidavit of Carlo Petrucci, Sr. submitted in support of **Berkshire's Motion**. Plaintiff persists that Berkshire got it wrong because his occupation was that of "doctor" and not "medical director." But Plaintiff ignores the Petrucci Affidavit, which explains that the CPT codes for the total billed charges for AM PM, Urgent Care, Denny Martin MD PC, Transitional Care, and the other entities revealed that Plaintiff's billed charges for patient care accounted for merely 1.3% of the total billed charges for those companies for the period June 2018 through August 2019. Plaintiff argues that the percentage was actually 5% although he fails to explain how that calculation was derived. The CPT report is a mathematical analysis—built upon data provided by Plaintiff himself—that demonstrates that Plaintiff's occupation for the twelve-month period before he claimed disability was that of a medical director of a Medicaid/Medicare focused practice group despite whatever claims he now makes to the contrary.

Moreover, with no support at all, Plaintiff claims: "To the best of my recollection, by 2019 I had non-Medicare/Medicaid revenues in excess of $200,000 per month." (Martin Aff ¶ 45). However, no data to support that statement was provided. In short, just because Plaintiff says something is true does not make it so.

Plaintiff cites to *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) and other related cases, to support the conclusion that Plaintiff's occupation was that of a doctor. *Kinstler,* and the other cases cited by Plaintiff, are distinguishable because the analysis focused upon the meaning of the term "regular occupation," an undefined term in Kinstler's policy.

Id. at 252. In contrast, the term "Total Disability" in the policies at issue here focus upon the term "Your Occupation," which is a defined term in the policies. The term "regular occupation" does not appear anywhere in Plaintiff's policies. As such, the *Kintsler* analysis (discussing the meaning for "regular occupation") may be disregarded.

The policies at issue here, the ones that matter, define "Total Disability" or "Totally Disabled" to mean, in part, that, "solely due to injury or Sickness, you are not able to perform the material and substantial duties, of **Your Occupation**." (Emphasis added). In turn, the policies define "Your Occupation" to mean, in part, "the occupation (or occupations if more than one) in which You are Gainfully Employed **during the 12 months prior to the time You become disabled**." (Emphasis added). Gainfully Employed or Gainful Employment means "actively at work or engaged in activities for income, renumeration, or profit." Accordingly, there is no ambiguity and no need to compare the meaning of the policy terms as issue in *Kinstler*. The focus of the analysis is the occupation in which Plaintiff, Denny Martin, was gainfully employed in the 12 months prior to when he became disabled. Therefore, an examination of Plaintiff's CPT codes over the period June 2018 through August 2019 provides the relevant analysis for determining "Your Occupation" in this case.

In his policy application (application to policy Z9836160 from 2018, for example, **Berkshire Motion,** Ex. J), Plaintiff identified his *employer* (i.e., the entity in which he was gainfully employed) as AM PM and described his occupational duties as "medical practice 92% administrative 8%." However, this statement and purported segregation of job duties does not add up when compared to the CPT codes Plaintiff produced for that same period (i.e., June 2018 through August 2019). The codes indicate that Plaintiff's billing only accounted for 1.3% of all patient care billings for the entities. These numbers are nowhere close to the

5

practice/administration split that Plaintiff represented to Berkshire in his signed policy application. In other words, what Plaintiff said on the policy applications is irrelevant for what his actual occupation was years later in the twelve-month period before he filed his disability claim. In fact, the CPT code analysis flips those numbers and demonstrates that Plaintiff's occupation was, in fact, that of an administrator of AM PM, focused on clientele insured by federally funded insurance during the 12 months prior to the time he allegedly became disabled, with a sliver of work as a practicing physician.

Plaintiff's situation cannot be analyzed in a vacuum. His viable occupational options must be evaluated based on the facts. He had practice restrictions that cut to the core of what he did – managing a Medicaid/Medicare focused practice group and treating a minimal amount of Medicare/Medicaid patients. All these factors lead to the conclusion that Plaintiff would be prevented from obtaining work in the medical field with any medical provider as a doctor and, for that matter, even as a medical director supervising a practice and coordinating patient care when he was precluded from having anything to do with billing Medicare and/or Medicaid.

### 3. There is No Evidence Presented that Plaintiff's Alleged Factual Disability Pre-Dated his Legal Disability

Plaintiff's contention that his medical issue pre-dates the legal disability is supported solely by his own self-serving statements and the affidavit of his domestic partner, as well as references to certain statements made by prior employees. But the facts (emails and medical records) demonstrate that in the months leading to his arrest, Plaintiff was engaged in expanding AM PM's business and had not complained to a single medical provider of any illness. Plaintiff's characterization of his efforts to expand AM PM as follow up to plans made long ago is the type of conclusory statement that Berkshire anticipated Plaintiff would offer in response to the record. See, Memorandum of Law, pp. 9 – 10. It defies credulity that Plaintiff would engage in

significant efforts to expand the business of AM PM when simultaneously, according to Plaintiff, he suffered from an illness with pain worse than a 10/10 that purportedly required him to restrict work activities. (Berkshire Motion, Ex D p. 19).

Most importantly, even now, faced with this motion, Plaintiff can identify no medical evidence in the record of a purported disability prior to when Plaintiff was arrested. Indeed, even Plaintiff's reliance on the Social Security Administration decision indicates he was disabled "as of" October 1, 2019 (after the Release Order was issued). [1] In short, Plaintiff's chronology of his purported illness reveals an important fact: to the extent any medical providers offered a diagnosis of an illness or recommended further testing or procedures, all such events occurred *after* October 8, 2019, the first date Plaintiff sought treatment for an alleged sickness. By that time, AM PM was in the grip of the governmental restrictions that had already set in motion the circumstances that led to the abrupt closure of the medical practice.

### B. Plaintiff is Not Entitled to Benefits Under the Overhead Expense Policies

With respect to the Overhead Expense ("OE") policies, as Plaintiff concedes, the relevant policy language states:

> Covered Overhead Expenses means the normal, necessary, and customary expenses that You **incur and pay in the continued operation** of Your Business. (Emphasis added). (Kenigsberg Dec Ex K at p. 490Policy10).

The crux of Plaintiff's opposition is that "Plaintiff's businesses were operational after the date of his arrest and have continued operating for years thereafter." (Pl Memo at p. 22). Plaintiff goes on to state:

---

[1] Plaintiff's submission of the Social Security Administration ("SSA") Decision is without consequence to Berkshire's motion. A decision by the SSA has no impact on a factual disability issue. There is no evidence that the SSA addressed the legal disability issue (which is doubtful), and the SSA's decision to issue benefits has no bearing whatsoever on that analysis. Likewise, Plaintiff's reference to his hired experts' conclusions has no bearing on the legal disability analysis and should be disregarded by the Court.

7

> Plaintiff owns—and has owned at all relevant times—several entities: Denny Martin MD PC; AM PM Medical PC; Transitional Care Medical Services PLLC; AM PM Urgent Care; and Martin Enterprises. Plaintiff has not sold any of these entities, nor has he dissolved them. While those entities have stopped providing medical care to patients, that does not mean that they have ceased operations." (*Id.* at p. 24).

Plaintiff's statements simply make no sense. How can medical practices that: (1) treat no patients, (2) bill no services; (3) provide no services of any kind; and (4) employ no one be in "continued operation"? There has been no evidence presented in opposition to the motion that, in fact, these entities continue to be operational other than Plaintiff's claim. Furthermore, Plaintiff cites no authority for his apparent argument that because a business has not been formally dissolved it is still in "operation." Businesses close operations every day but fail to formally file the appropriate dissolution documents with the New York Secretary of State.

More importantly, the claim that these businesses are in "continued operation" is directly contradicted by no less than *four* sworn affidavits Plaintiff placed before another court in the matter of *Allison Martin v. Denny Martin, M.D.* (Index No. 303503/2018). In the first, he stated:

> "As Medicare patients comprised more than eighty percent (80%) of my business, *I was compelled to close my medical practice*, and as a result, as of October, 2019, I have no income. (Affidavit of Denny Martin, M.D., dated March 5, 2020 (emphasis added)).

In three others, he stated:

> "As Medicare patients comprised more than eighty percent (80%) of my business, and the total percentage of patients with Medicare B and Medicare C (HMO's) is well over ninety-seven (97%), and I am excluded from all of them, *I was compelled to close my practice*. As a result, as of October 2019, I have no income." (August 4, 2020, October 29, 2020 and July 12, 2021 Affidavits of Denny Martin, M.D (emphasis added)).[2] Kenigsberg Reply Dec. Ex. B-E.

---

[2] "Under the sham affidavit doctrine, 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Crawford*, 758 F.3d 473 at 482 (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). The analysis should be no different when evaluating affidavits filed in a court of law (even if in a separate proceeding). Martin should be judicially estopped from claiming his practice was operational now when he has stated multiple times before another court the exact opposite.

Furthermore, this claim is in direct contradiction to the email he sent to his payroll assistant on or about October 8, 2019 (before he even saw his first medical professional for his condition) wherein he stated: "[T]he practice is phasing out." (Berkshire Motion, R56, par. 24).

Additionally, the policy language refers to "expenses You incur and pay in the continued operation of the business." And "Reimbursable Expenses" are defined as "Covered Overhead Expenses You incur *and pay* for the claimed month less Prior Coverage that month." (Kenigsberg Dec Ex K at 490Policy13 (emphasis added)). These are therefore *reimbursable expenses*, i.e., costs incurred and paid by the insured that the insurer later is required to *reimburse*. Not only is there is no evidence (other than Plaintiff's new affidavit, which contradicts his four prior affidavits) that these businesses were in operation, there is no evidence that any of these expenses (purportedly mortgages, leases and real estate taxes) were ever incurred or *paid*. There was not one lease, invoice or payment request attached to the opposition to establish these costs, nor was there a cancelled check to establish they were ever *paid*. They were never incurred or paid because his businesses were not in "operation."

Regarding the authority cited by Defendant, Plaintiff argues that "in nearly every one of those cases, the insured—unlike Plaintiff—either sold or entirely closed up his business." (Pl Memo at p. 25). For the reasons set forth above, it is clear that Plaintiff *did* close his business. He has admitted it. And, of course, whether the businesses were sold or closed is a distinction without a difference.

Plaintiff also argues, "it *does not appear* that any of those cases addressed the policy language at issue here." (*Id.* (Emphasis added)). Actually, the language was remarkably similar.

In *Chenvert* the relevant policy language stated (emphasis added)[3]:

---

[3] *Chenvert v. Paul Revere Life Ins. Co.*, No. CIV.03-0330-SLR, 2004 WL 1739718, at *3 (D. Del. Aug. 2, 2004)

"[c]overed [m]onthly [e]xpense" is defined as "those fixed, monthly expenses **incurred in [y]our [o]ccupation** that are ordinary and necessary **in the operation of [y]our business** or profession."

In *Klock*, the policy language stated (emphasis added)[4]:

'The covered Monthly Overhead Expense hereunder shall consist of … and such other **fixed expenses as are normal and customary in the conduct and operation of the Insured's office**, but shall not include any salary, fees, drawing account, or any other remuneration for the Insured or any other member of the Insured's profession or any person employed to perform the duties of the Insured, and shall not include …

Notably, in one case the language was, in fact, slightly different. Specifically, in *Wilson v. Monarch Life Ins. Co.*, 971 F.2d 312, 313 (9th Cir. 1992), the language stated: "the usual overhead **expenses you have in running your office** or business." While the term "operation" was not used in that policy, instead, it was the phrase "running your business," the Court upheld the lower court's grant of summary judgment in favor of the insurer because the "mere collection of accounts receivable does not constitute 'running' a chiropractic office." *Id.* Even more noteworthy, the Ninth Circuit in rendering that decision relied upon *Koch* (noted above) and the fact that the court there held that post-closure lease obligations (exactly what Plaintiff seeks here) were not considered ongoing costs in the operation of that business. In other words, the Ninth Circuit, looking at *Koch* (where the word "operation" was directly at issue) agreed that post-closure lease obligations were not costs incurred in running a business.

## **CONCLUSION**

For all the reasons set forth herein, Defendant respectfully requests that this Court grant Defendant's motion for summary judgment dismissing the Complaint in its entirety and grant such other relief as the Court deems just and proper.

---

[4] *Paul Revere Life Ins. Co. v. Klock*, 169 So. 2d 493, 494 (Fla. Dist. Ct. App. 1964),

Dated: Uniondale, New York
   September 12, 2022

         Respectfully Submitted,

         **RIVKIN RADLER LLP**

         By: /s/ *Kenneth C. Murphy*_____
         Kenneth (Casey) Murphy
         Jay Kenigsberg
         926 RXR Plaza
         Uniondale, New York 11556
         Tel: (516) 357-3000
         Fax: (516) 357-3333
         Email: casey.murphy@rivkin.com
         Attorneys for Defendant
         Berkshire Life Insurance Company of America

5966577